# NEBRASKA PRESS ASSN. ET AL. *v.* STUART, JUDGE, ET AL.

No. 75–817.   Argued April 19, 1976—Decided June 30, 1976

Burger, C. J., delivered the opinion of the Court, in which White, Blackmun, Powell, and Rehnquist, JJ., joined. White, J., *post*, p. 570, and Powell, J., *post*, p. 571, filed concurring opinions. Brennan, J., filed an opinion concurring in the judgment, in which Stewart and Marshall, JJ., joined, *post*, p. 572. Stevens, J., filed an opinion concurring in the judgment, *post*, p. 617.

*E. Barrett Prettyman, Jr.,* argued the cause for petitioners. With him on the briefs were *James L. Koley* and *Stephen T. McGill.*

*Harold Mosher,* Assistant Attorney General of Nebraska, argued the cause for respondent Stuart. With him on the brief was *Paul L. Douglas,* Attorney General. *Milton R. Larson* argued the cause for respondent State of Nebraska. With him on the brief was *Erwin N. Griswold. Leonard P. Vyhnalek* filed a brief for respondent Simants.

*Floyd Abrams* argued the cause for the National Broadcasting Co. et al. as *amici curiae* urging reversal. With him on the brief were *Eugene R. Scheiman, Corydon B. Dunham, David H. Marion, Harold E. Kohn, Robert Sack, John B. Summers, William Barnabas McHenry, David Otis Fuller, Jr., Richard M. Schmidt, Jr., Ian Volner,* and *J. Laurent Scharff.**

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

The respondent State District Judge entered an order restraining the petitioners from publishing or broadcasting accounts of confessions or admissions made by the accused or facts "strongly implicative" of the accused in a widely reported murder of six persons. We granted certiorari to decide whether the entry of such an order on the showing made before the state court violated the constitutional guarantee of freedom of the press.

---

*Briefs of *amici curiae* urging reversal were filed by *Melvin L. Wulf, Joel M. Gora, Charles C. Marson,* and *Joseph Remcho* for the American Civil Liberties Union et al.; by *Arthur B. Hanson* for the American Newspaper Publishers Assn.; by *William I. Harkaway* for the National Press Club; by *Lawrence Speiser* for the Reporters Committee for Freedom of the Press Legal Defense and Research Fund; by *Don H. Reuben* and *Lawrence Gunnels* for the Tribune Co.; and by *Joseph A. Califano, Jr., John G. Kester, Richard M. Cooper, Alan R. Finberg, Robert C. Lobdell, David R. Hardy, Dan Paul, Edgar A. Zingman,* and *Donald B. Holbrook* for the Washington Post Co. et al.

I

On the evening of October 18, 1975, local police found the six members of the Henry Kellie family murdered in their home in Sutherland, Neb., a town of about 850 people. Police released the description of a suspect, Erwin Charles Simants, to the reporters who had hastened to the scene of the crime. Simants was arrested and arraigned in Lincoln County Court the following morning, ending a tense night for this small rural community.

The crime immediately attracted widespread news coverage, by local, regional, and national newspapers, radio and television stations. Three days after the crime, the County Attorney and Simants' attorney joined in asking the County Court to enter a restrictive order relating to "matters that may or may not be publicly reported or disclosed to the public," because of the "mass coverage by news media" and the "reasonable likelihood of prejudicial news which would make difficult, if not impossible, the impaneling of an impartial jury and tend to prevent a fair trial." The County Court heard oral argument but took no evidence; no attorney for members of the press appeared at this stage. The County Court granted the prosecutor's motion for a restrictive order and entered it the next day, October 22. The order prohibited everyone in attendance from "releas[ing] or authoriz[ing] the release for public dissemination in any form or manner whatsoever any testimony given or evidence adduced"; the order also required members of the press to observe the Nebraska Bar-Press Guidelines.[1]

---

[1] These Guidelines are voluntary standards adopted by members of the state bar and news media to deal with the reporting of crimes and criminal trials. They outline the matters of fact that may appropriately be reported, and also list what items are not generally appropriate for reporting, including confessions, opinions

Simants' preliminary hearing was held the same day, open to the public but subject to the order. The County Court bound over the defendant for trial to the State District Court. The charges, as amended to reflect the autopsy findings, were that Simants had committed the murders in the course of a sexual assault.

Petitioners—several press and broadcast associations, publishers, and individual reporters—moved on October 23 for leave to intervene in the District Court, asking that the restrictive order imposed by the County Court be vacated. The District Court conducted a hearing, at which the County Judge testified and newspaper articles about the *Simants* case were admitted in evidence. The District Judge granted petitioners' motion to intervene and, on October 27, entered his own restrictive order. The judge found "because of the nature of the crimes charged in the complaint that there is a clear and present danger that pre-trial publicity could impinge upon the defendant's right to a fair trial." The order applied only until the jury was impaneled, and specifically prohibited petitioners from reporting five subjects: (1) the existence or contents of a confession Simants had made to law enforcement officers, which had been introduced in open court at arraignment; (2) the fact or nature of statements Simants had made to other persons; (3) the contents of a note he had written the night of the crime; (4) certain aspects of the medical testimony at the preliminary hearing; and (5) the identity of the

on guilt or innocence, statements that would influence the outcome of a trial, the results of tests or examinations, comments on the credibility of witnesses, and evidence presented in the jury's absence. The publication of an accused's criminal record should, under the Guidelines, be "considered very carefully." The Guidelines also set out standards for taking and publishing photographs, and set up a joint bar-press committee to foster cooperation in resolving particular problems that emerge.

victims of the alleged sexual assault and the nature of the assault. It also prohibited reporting the exact nature of the restrictive order itself. Like the County Court's order, this order incorporated the Nebraska Bar-Press Guidelines. Finally, the order set out a plan for attendance, seating, and courthouse traffic control during the trial.

Four days later, on October 31, petitioners asked the District Court to stay its order. At the same time, they applied to the Nebraska Supreme Court for a writ of mandamus, a stay, and an expedited appeal from the order. The State of Nebraska and the defendant Simants intervened in these actions. The Nebraska Supreme Court heard oral argument on November 25, and issued its *per curiam* opinion December 1. *State* v. *Simants*, 194 Neb. 783, 236 N. W. 2d 794 (1975).[2]

---

[2] In the interim, petitioners applied to MR. JUSTICE BLACKMUN as Circuit Justice for a stay of the State District Court's order. He postponed ruling on the application out of deference to the Nebraska Supreme Court, 423 U. S. 1319 (Nov. 13, 1975) (in chambers); when he concluded that the delay before that court had "exceed[ed] tolerable limits," he entered an order. 423 U. S. 1327, 1329 (Nov. 20, 1975) (in chambers). We need not set out in detail MR. JUSTICE BLACKMUN's careful decision on this difficult issue. In essence he stayed the order insofar as it incorporated the admonitory Bar-Press Guidelines and prohibited reporting of some other matters. But he declined "at least on an application for a stay and at this distance, [to] impose a prohibition upon the Nebraska courts from placing any restrictions at all upon what the media may report prior to trial." *Id.*, at 1332. He therefore let stand that portion of the District Court's order that prohibited reporting the existence or nature of a confession, and declined to prohibit that court from restraining publication of facts that were so "highly prejudicial" to the accused or "strongly implicative" of him that they would "irreparably impair the ability of those exposed to them to reach an independent and impartial judgment as to guilt." *Id.*, at 1333. Subsequently, petitioners applied for a more extensive stay; this was denied by the full Court. 423 U. S. 1027 (1975).

The Nebraska Supreme Court balanced the "heavy presumption against . . . constitutional validity" that an order restraining publication bears, *New York Times Co.* v. *United States*, 403 U. S. 713, 714 (1971), against the importance of the defendant's right to trial by an impartial jury. Both society and the individual defendant, the court held, had a vital interest in assuring that Simants be tried by an impartial jury. Because of the publicity surrounding the crime, the court determined that this right was in jeopardy. The court noted that Nebraska statutes required the District Court to try Simants within six months of his arrest, and that a change of venue could move the trial only to adjoining counties, which had been subject to essentially the same publicity as Lincoln County. The Nebraska Supreme Court held that "[u]nless the absolutist position of the relators was constitutionally correct, it would appear that the District Court acted properly." 194 Neb., at 797, 236 N. W. 2d, at 803.

The Nebraska Supreme Court rejected that "absolutist position," but modified the District Court's order to accommodate the defendant's right to a fair trial and the petitioners' interest in reporting pretrial events. The order as modified prohibited reporting of only three matters: (a) the existence and nature of any confessions or admissions made by the defendant to law enforcement officers, (b) any confessions or admissions made to any third parties, except members of the press, and (c) other facts "strongly implicative" of the accused. The Nebraska Supreme Court did not rely on the Nebraska Bar-Press Guidelines. See n. 1, *supra*. After construing Nebraska law to permit closure in certain circumstances, the court remanded the case to the District Judge for reconsideration of the issue whether pretrial hearings should be closed to the press and public.

We granted certiorari to address the important issues raised by the District Court order as modified by the Nebraska Supreme Court, but we denied the motion to expedite review or to stay entirely the order of the State District Court pending Simants' trial. 423 U. S. 1027 (1975). We are informed by the parties that since we granted certiorari, Simants has been convicted of murder and sentenced to death. His appeal is pending in the Nebraska Supreme Court.

## II

The order at issue in this case expired by its own terms when the jury was impaneled on January 7, 1976. There were no restraints on publication once the jury was selected, and there are now no restrictions on what may be spoken or written about the *Simants* case. Intervenor Simants argues that for this reason the case is moot.

Our jurisdiction under Art. III, § 2, of the Constitution extends only to actual cases and controversies. *Indianapolis School Comm'rs* v. *Jacobs,* 420 U. S. 128 (1975); *Sosna* v. *Iowa,* 419 U. S. 393, 397–403 (1975). The Court has recognized, however, that jurisdiction is not necessarily defeated simply because the order attacked has expired, if the underlying dispute between the parties is one "capable of repetition, yet evading review." *Southern Pacific Terminal Co.* v. *ICC,* 219 U. S. 498, 515 (1911).

The controversy between the parties to this case is "capable of repetition" in two senses. First, if Simants' conviction is reversed by the Nebraska Supreme Court and a new trial ordered, the District Court may enter another restrictive order to prevent a resurgence of prejudicial publicity before Simants' retrial. Second, the State of Nebraska is a party to this case; the Nebraska Supreme Court's decision authorizes state prosecutors to

seek restrictive orders in appropriate cases. The dispute between the State and the petitioners who cover events throughout the State is thus "capable of repetition." Yet, if we decline to address the issues in this case on grounds of mootness, the dispute will evade review, or at least considered plenary review in this Court, since these orders are by nature short-lived. See, *e. g., Weinstein* v. *Bradford,* 423 U. S. 147 (1975); *Sosna* v. *Iowa, supra; Roe* v. *Wade,* 410 U. S. 113, 125 (1973); *Moore* v. *Ogilvie,* 394 U. S. 814, 816 (1969); *Carroll* v. *Princess Anne,* 393 U. S. 175, 178–179 (1968). We therefore conclude that this case is not moot, and proceed to the merits.

### III

The problems presented by this case are almost as old as the Republic. Neither in the Constitution nor in contemporaneous writings do we find that the conflict between these two important rights was anticipated, yet it is inconceivable that the authors of the Constitution were unaware of the potential conflicts between the right to an unbiased jury and the guarantee of freedom of the press. The unusually able lawyers who helped write the Constitution and later drafted the Bill of Rights were familiar with the historic episode in which John Adams defended British soldiers charged with homicide for firing into a crowd of Boston demonstrators; they were intimately familiar with the clash of the adversary system and the part that passions of the populace sometimes play in influencing potential jurors. They did not address themselves directly to the situation presented by this case; their chief concern was the need for freedom of expression in the political arena and the dialogue in ideas. But they recognized that there were risks to private rights from an unfettered press. Jefferson, for ex-

ample, writing from Paris in 1786 concerning press attacks on John Jay, stated:

> "In truth it is afflicting that a man who has past his life in serving the public . . . should yet be liable to have his peace of mind so much disturbed by any individual who shall think proper to arraign him in a newspaper. It is however an evil for which there is no remedy. Our liberty depends on the freedom of the press, and that cannot be limited without being lost. . . ." 9 Papers of Thomas Jefferson 239 (J. Boyd ed. 1954).

See also F. Mott, Jefferson and the Press 21, 38–46 (1943).

The trial of Aaron Burr in 1807 presented Mr. Chief Justice Marshall, presiding as a trial judge, with acute problems in selecting an unbiased jury. Few people in the area of Virginia from which jurors were drawn had not formed some opinions concerning Mr. Burr or the case, from newspaper accounts and heightened discussion both private and public. The Chief Justice conducted a searching *voir dire* of the two panels eventually called, and rendered a substantial opinion on the purposes of *voir dire* and the standards to be applied. See 1 Causes Celebres, Trial of Aaron Burr for Treason 404–427, 473–481 (1879); *United States* v. *Burr*, 25 F. Cas. 49 (No. 14,692g) (CC Va. 1807). Burr was acquitted, so there was no occasion for appellate review to examine the problem of prejudicial pretrial publicity. Mr. Chief Justice Marshall's careful *voir dire* inquiry into the matter of possible bias makes clear that the problem is not a new one.

The speed of communication and the pervasiveness of the modern news media have exacerbated these problems, however, as numerous appeals demonstrate. The trial of Bruno Hauptmann in a small New Jersey community for

the abduction and murder of the Charles Lindberghs' infant child probably was the most widely covered trial up to that time, and the nature of the coverage produced widespread public reaction. Criticism was directed at the "carnival" atmosphere that pervaded the community and the courtroom itself. Responsible leaders of press and the legal profession—including other judges—pointed out that much of this sorry performance could have been controlled by a vigilant trial judge and by other public officers subject to the control of the court. See generally Hudon, Freedom of the Press Versus Fair Trial: The Remedy Lies With the Courts, 1 Val. U. L. Rev. 8, 12–14 (1966); Hallam, Some Object Lessons on Publicity in Criminal Trials, 24 Minn. L. Rev. 453 (1940); Lippmann, The Lindbergh Case in Its Relation to American Newspapers, in Problems of Journalism 154–156 (1936).

The excesses of press and radio and lack of responsibility of those in authority in the *Hauptmann* case and others of that era led to efforts to develop voluntary guidelines for courts, lawyers, press, and broadcasters. See generally J. Lofton, Justice and the Press 117–130 (1966).[3] The effort was renewed in 1965 when the American Bar Association embarked on a project to develop standards for all aspects of criminal justice, including guidelines to accommodate the right to a fair trial and the rights of a free press. See Powell, The Right to a

---

[3] The Warren Commission conducting an inquiry into the murder of President Kennedy implied grave doubts whether, after the dissemination of "a great deal of misinformation" prejudicial to Oswald, a fair trial could be had. Report of the President's Commission on the Assassination of President John F. Kennedy 231 (1964). Probably the same could be said in turn with respect to a trial of Oswald's murderer even though a multitude were eyewitnesses to the guilty act. See generally *id.*, at 231–242; Jaffe, Trial by Newspaper, 40 N. Y. U. L. Rev. 504 (1965); Powell, The Right to a Fair Trial, 51 A. B. A. J. 534 (1965).

Fair Trial, 51 A. B. A. J. 534 (1965). The resulting standards, approved by the Association in 1968, received support from most of the legal profession. American Bar Association Project on Standards for Criminal Justice, Fair Trial and Free Press (Approved Draft 1968). Other groups have undertaken similar studies. See Report of the Judicial Conference Committee on the Operation of the Jury System, "Free Press-Fair Trial" Issue, 45 F. R. D. 391 (1968); Special Committee on Radio, Television, and the Administration of Justice of the Association of the Bar of the City of New York, Freedom of the Press and Fair Trial (1967). In the wake of these efforts, the cooperation between bar associations and members of the press led to the adoption of voluntary guidelines like Nebraska's. See n. 1, *supra;* American Bar Association Legal Advisory Committee on Fair Trial and Free Press, The Rights of Fair Trial and Free Press 1–6 (1969).

In practice, of course, even the most ideal guidelines are subjected to powerful strains when a case such as Simants' arises, with reporters from many parts of the country on the scene. Reporters from distant places are unlikely to consider themselves bound by local standards. They report to editors outside the area covered by the guidelines, and their editors are likely to be guided only by their own standards. To contemplate how a state court can control acts of a newspaper or broadcaster outside its jurisdiction, even though the newspapers and broadcasts reach the very community from which jurors are to be selected, suggests something of the practical difficulties of managing such guidelines.

The problems presented in this case have a substantial history outside the reported decisions of courts, in the efforts of many responsible people to accommodate the competing interests. We cannot resolve all of them, for

it is not the function of this Court to write a code. We look instead to this particular case and the legal context in which it arises.

## IV

The Sixth Amendment in terms guarantees "trial, by an impartial jury . . ." in federal criminal prosecutions. Because "trial by jury in criminal cases is fundamental to the American scheme of justice," the Due Process Clause of the Fourteenth Amendment guarantees the same right in state criminal prosecutions. *Duncan* v. *Louisiana,* 391 U. S. 145, 149 (1968).

> "In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors. . . . 'A fair trial in a fair tribunal is a basic requirement of due process.' *In re Murchison,* 349 U. S. 133, 136. In the ultimate analysis, only the jury can strip a man of his liberty or his life. In the language of Lord Coke, a juror must be as 'indifferent as he stands unsworn.' Co. Litt. 155b. His verdict must be based upon the evidence developed at the trial." *Irvin* v. *Dowd,* 366 U. S. 717, 722 (1961).

In the overwhelming majority of criminal trials, pretrial publicity presents few unmanageable threats to this important right. But when the case is a "sensational" one tensions develop between the right of the accused to trial by an impartial jury and the rights guaranteed others by the First Amendment. The relevant decisions of this Court, even if not dispositive, are instructive by way of background.

In *Irvin* v. *Dowd, supra,* for example, the defendant was convicted of murder following intensive and hostile news coverage. The trial judge had granted a defense motion for a change of venue, but only to an

adjacent county, which had been exposed to essentially the same news coverage. At trial, 430 persons were called for jury service; 268 were excused because they had fixed opinions as to guilt. Eight of the 12 who served as jurors thought the defendant guilty, but said they could nevertheless render an impartial verdict. On review the Court vacated the conviction and death sentence and remanded to allow a new trial for, "[w]ith his life at stake, it is not requiring too much that petitioner be tried in an atmosphere undisturbed by so huge a wave of public passion . . . ." 366 U. S., at 728.

Similarly, in *Rideau v. Louisiana,* 373 U. S. 723 (1963), the Court reversed the conviction of a defendant whose staged, highly emotional confession had been filmed with the cooperation of local police and later broadcast on television for three days while he was awaiting trial, saying "[a]ny subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality." *Id.,* at 726. And in *Estes v. Texas,* 381 U. S. 532 (1965), the Court held that the defendant had not been afforded due process where the volume of trial publicity, the judge's failure to control the proceedings, and the telecast of a hearing and of the trial itself "inherently prevented a sober search for the truth." *Id.,* at 551. See also *Marshall v. United States,* 360 U. S. 310 (1959).

In *Sheppard v. Maxwell,* 384 U. S. 333 (1966), the Court focused sharply on the impact of pretrial publicity and a trial court's duty to protect the defendant's constitutional right to a fair trial. With only Mr. Justice Black dissenting, and he without opinion, the Court ordered a new trial for the petitioner, even though the first trial had occurred 12 years before. Beyond doubt the press had shown no responsible concern for the constitutional guarantee of a fair trial; the com-

munity from which the jury was drawn had been inundated by publicity hostile to the defendant. But the trial judge "did not fulfill his duty to protect [the defendant] from the inherently prejudicial publicity which saturated the community and to control disruptive influences in the courtroom." *Id.*, at 363. The Court noted that "unfair and prejudicial news comment on pending trials has become increasingly prevalent," *id.*, at 362, and issued a strong warning:

> "Due process requires that the accused receive a ;~.' trial by an impartial jury free from outside influences. Given the pervasiveness of modern communications and the difficulty of effacing prejudicial publicity from the minds of the jurors, *the trial courts must take strong measures to ensure that the balance is never weighed against the accused. . . .* Of course, there is nothing that proscribes the press from reporting events that transpire in the courtroom. But where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should *continue the case* until the threat abates, *or transfer it* to another county not so permeated with publicity. In addition, *sequestration of the jury* was something the judge should have raised *sua sponte* with counsel. If publicity during the proceedings threatens the fairness of the trial, a new trial should be ordered. But we must remember that reversals are but palliatives; the cure lies in those remedial measures that will prevent the prejudice at its inception. The courts must take such steps by rule and regulation that will protect their processes from prejudicial outside interferences. *Neither prosecutors, counsel for defense, the accused, witnesses, court staff nor enforcement officers coming under the jurisdiction of the*

*court should be permitted to frustrate its function.*
Collaboration between counsel and the press as to
information affecting the fairness of a criminal trial
is not only subject to regulation, but is highly cen-
surable and worthy of disciplinary measures." *Id.,*
at 362–363 (emphasis added).

Because the trial court had failed to use even minimal
efforts to insulate the trial and the jurors from the
"deluge of publicity," *id.,* at 357, the Court vacated the
judgment of conviction and a new trial followed, in which
the accused was acquitted.

Cases such as these are relatively rare, and we have
held in other cases that trials have been fair in spite of
widespread publicity. In *Stroble* v. *California,* 343 U. S.
181 (1952), for example, the Court affirmed a conviction
and death sentence challenged on the ground that pre-
trial news accounts, including the prosecutor's release of
the defendant's recorded confession, were allegedly so
inflammatory as to amount to a denial of due process.
The Court disapproved of the prosecutor's conduct, but
noted that the publicity had receded some six weeks
before trial, that the defendant had not moved for a
change of venue, and that the confession had been found
voluntary and admitted in evidence at trial. The Court
also noted the thorough examination of jurors on *voir
dire* and the careful review of the facts by the state
courts, and held that petitioner had failed to demon-
strate a denial of due process. See also *Murphy* v.
*Florida,* 421 U. S. 794 (1975); *Beck* v. *Washington,* 369
U. S. 541 (1962).

Taken together, these cases demonstrate that pretrial
publicity—even pervasive, adverse publicity—does not
inevitably lead to an unfair trial. The capacity of the
jury eventually impaneled to decide the case fairly is in-
fluenced by the tone and extent of the publicity,

which is in part, and often in large part, shaped by what attorneys, police, and other officials do to precipitate news coverage. The trial judge has a major responsibility. What the judge says about a case, in or out of the courtroom, is likely to appear in newspapers and broadcasts. More important, the measures a judge takes or fails to take to mitigate the effects of pretrial publicity—the measures described in *Sheppard*—may well determine whether the defendant receives a trial consistent with the requirements of due process. That this responsibility has not always been properly discharged is apparent from the decisions just reviewed.

The costs of failure to afford a fair trial are high. In the most extreme cases, like *Sheppard* and *Estes,* the risk of injustice was avoided when the convictions were reversed. But a reversal means that justice has been delayed for both the defendant and the State; in some cases, because of lapse of time retrial is impossible or further prosecution is gravely handicapped. Moreover, in borderline cases in which the conviction is not reversed, there is some possibility of an injustice unredressed. The "strong measures" outlined in *Sheppard* v. *Maxwell* are means by which a trial judge can try to avoid exacting these costs from society or from the accused.

The state trial judge in the case before us acted responsibly, out of a legitimate concern, in an effort to protect the defendant's right to a fair trial.[4] What we must decide is not simply whether the Nebraska courts erred

---

[4] The record also reveals that counsel for both sides acted responsibly in this case, and there is no suggestion that either sought to use pretrial news coverage for partisan advantage. A few days after the crime, newspaper accounts indicated that the prosecutor had announced the existence of a confession; we learned at oral argument that these accounts were false, although in fact a confession had been made. Tr. of Oral Arg. 36–37, 59.

in seeing the possibility of real danger to the defendant's rights, but whether in the circumstances of this case the means employed were foreclosed by another provision of the Constitution.

## V

The First Amendment provides that "Congress shall make no law . . . abridging the freedom . . . of the press," and it is "no longer open to doubt that the liberty of the press, and of speech, is within the liberty safeguarded by the due process clause of the Fourteenth Amendment from invasion by state action." *Near* v. *Minnesota ex rel. Olson,* 283 U. S. 697, 707 (1931). See also *Grosjean* v. *American Press Co.,* 297 U. S. 233, 244 (1936). The Court has interpreted these guarantees to afford special protection against orders that prohibit the publication or broadcast of particular information or commentary—orders that impose a "previous" or "prior" restraint on speech. None of our decided cases on prior restraint involved restrictive orders entered to protect a defendant's right to a fair and impartial jury, but the opinions on prior restraint have a common thread relevant to this case.

In *Near* v. *Minnesota ex rel. Olson, supra,* the Court held invalid a Minnesota statute providing for the abatement as a public nuisance of any "malicious, scandalous and defamatory newspaper, magazine or other periodical." Near had published an occasional weekly newspaper described by the County Attorney's complaint as "largely devoted to malicious, scandalous and defamatory articles" concerning political and other public figures. 283 U. S., at 703. Publication was enjoined pursuant to the statute. Excerpts from Near's paper, set out in the dissenting opinion of Mr. Justice Butler, show beyond question that one of its principal characteristics was blatant anti-Semitism. See *id.,* at 723, 724–727, n. 1.

Mr. Chief Justice Hughes, writing for the Court, noted that freedom of the press is not an absolute right, and the State may punish its abuses. He observed that the statute was "not aimed at the redress of individual or private wrongs." *Id.,* at 708, 709. He then focused on the statute:

> "[T]he operation and effect of the statute in substance is that public authorities may bring the owner or publisher of a newspaper or periodical before a judge upon a charge of conducting a business of publishing scandalous and defamatory matter . . . and unless the owner or publisher is able . . . to satisfy the judge that the [matter is] true and . . . published with good motives . . . his newspaper or periodical is suppressed . . . . This is of the essence of censorship." *Id.,* at 713.

The Court relied on *Patterson* v. *Colorado ex rel. Attorney General,* 205 U. S. 454, 462 (1907): "[T]he main purpose of [the First Amendment] is 'to prevent all such *previous restraints* upon publications as had been practiced by other governments.' " [5]

The principles enunciated in *Near* were so universally accepted that the precise issue did not come before us again until *Organization for a Better Austin* v. *Keefe,*

---

[5] In *Near* v. *Minnesota,* Mr. Chief Justice Hughes was also able to say: "There is also the conceded authority of courts to punish for contempt when publications directly tend to prevent the proper discharge of judicial functions." 283 U. S., at 715. A subsequent line of cases limited sharply the circumstances under which courts may exact such punishment. See *Craig* v. *Harney,* 331 U. S. 367 (1947); *Pennekamp* v. *Florida,* 328 U. S. 331 (1946); *Bridges* v. *California,* 314 U. S. 252 (1941). Because these cases deal with punishment based on contempt, however, they deal with problems substantially different from those raised by prior restraint. See also Barist, The First Amendment and Regulation of Prejudicial Publicity—An Analysis, 36 Ford. L. Rev. 425, 433–442 (1968).

402 U. S. 415 (1971). There the state courts had enjoined the petitioners from picketing or passing out literature of any kind in a specified area. Noting the similarity to *Near* v. *Minnesota,* a unanimous Court held:

"Here, as in that case, the injunction operates, not to redress alleged private wrongs, but to suppress, on the basis of previous publications, distribution of literature 'of any kind' in a city of 18,000.

.        .        .        .        .

"Any prior restraint on expression comes to this Court with a 'heavy presumption' against its constitutional validity. *Carroll* v. *Princess Anne,* 393 U. S. 175, 181 (1968); *Bantam Books, Inc.* v. *Sullivan,* 372 U. S. 58, 70 (1963). Respondent thus carries a heavy burden of showing justification for the imposition of such a restraint. He has not met that burden. . . . Designating the conduct as an invasion of privacy, the apparent basis for the injunction here, is not sufficient to support an injunction against peaceful distribution of informational literature of the nature revealed by this record." 402 U. S., at 418–420.

More recently in *New York Times Co.* v. *United States,* 403 U. S. 713 (1971), the Government sought to enjoin the publication of excerpts from a massive, classified study of this Nation's involvement in the Vietnam conflict, going back to the end of the Second World War. The dispositive opinion of the Court simply concluded that the Government had not met its heavy burden of showing justification for the prior restraint. Each of the six concurring Justices and the three dissenting Justices expressed his views separately, but "every member of the Court, tacitly or explicitly, accepted the *Near* and *Keefe* condemnation of prior restraint as presumptively unconstitutional." *Pittsburgh Press Co.* v. *Human Rel.*

*Comm'n,* 413 U. S. 376, 396 (1973) (Burger, C. J., dissenting). The Court's conclusion in *New York Times* suggests that the burden on the Government is not reduced by the temporary nature of a restraint; in that case the Government asked for a temporary restraint solely to permit it to study and assess the impact on national security of the lengthy documents at issue.

The thread running through all these cases is that prior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights. A criminal penalty or a judgment in a defamation case is subject to the whole panoply of protections afforded by deferring the impact of the judgment until all avenues of appellate review have been exhausted. Only after judgment has become final, correct or otherwise, does the law's sanction become fully operative.

A prior restraint, by contrast and by definition, has an immediate and irreversible sanction. If it can be said that a threat of criminal or civil sanctions after publication "chills" speech, prior restraint "freezes" it at least for the time.[6]

The damage can be particularly great when the prior restraint falls upon the communication of news and commentary on current events. Truthful reports of public judicial proceedings have been afforded special protection against subsequent punishment. See *Cox Broadcasting Corp* v. *Cohn,* 420 U. S. 469, 492–493 (1975); see also, *Craig* v. *Harney,* 331 U. S. 367, 374 (1947). For the same reasons the protection against prior restraint should have particular force as applied to reporting of criminal proceedings, whether the crime in question is a single isolated act or a pattern of criminal conduct.

"A responsible press has always been regarded as

---

[6] See A. Bickel, The Morality of Consent 61 (1975).

the handmaiden of effective judicial administration, especially in the criminal field. Its function in this regard is documented by an impressive record of service over several centuries. The press does not simply publish information about trials but guards against the miscarriage of justice by subjecting the police, prosecutors, and judicial processes to extensive public scrutiny and criticism." *Sheppard* v. *Maxwell,* 384 U. S., at 350.

The extraordinary protections afforded by the First Amendment carry with them something in the nature of a fiduciary duty to exercise the protected rights responsibly—a duty widely acknowledged but not always observed by editors and publishers. It is not asking too much to suggest that those who exercise First Amendment rights in newspapers or broadcasting enterprises direct some effort to protect the rights of an accused to a fair trial by unbiased jurors.

Of course, the order at issue—like the order requested in *New York Times*—does not prohibit but only postpones publication. Some news can be delayed and most commentary can even more readily be delayed without serious injury, and there often is a self-imposed delay when responsible editors call for verification of information. But such delays are normally slight and they are self-imposed. Delays imposed by governmental authority are a different matter.

"We have learned, and continue to learn, from what we view as the unhappy experiences of other nations where government has been allowed to meddle in the internal editorial affairs of newspapers. Regardless of how beneficent-sounding the purposes of controlling the press might be, we . . . remain intensely skeptical about those measures that would allow government to insinuate itself into the editorial

rooms of this Nation's press." *Miami Herald Publishing Co.* v. *Tornillo*, 418 U. S. 241, 259 (1974) (WHITE, J., concurring).

See also *Columbia Broadcasting* v. *Democratic Comm.*, 412 U. S. 94 (1973). As a practical matter, moreover, the element of time is not unimportant if press coverage is to fulfill its traditional function of bringing news to the public promptly.

The authors of the Bill of Rights did not undertake to assign priorities as between First Amendment and Sixth Amendment rights, ranking one as superior to the other. In this case, the petitioners would have us declare the right of an accused subordinate to their right to publish in all circumstances. But if the authors of these guarantees, fully aware of the potential conflicts between them, were unwilling or unable to resolve the issue by assigning to one priority over the other, it is not for us to rewrite the Constitution by undertaking what they declined to do. It is unnecessary, after nearly two centuries, to establish a priority applicable in all circumstances. Yet it is nonetheless clear that the barriers to prior restraint remain high unless we are to abandon what the Court has said for nearly a quarter of our national existence and implied throughout all of it. The history of even wartime suspension of categorical guarantees, such as habeas corpus or the right to trial by civilian courts, see *Ex parte Milligan*, 4 Wall. 2 (1867), cautions against suspending explicit guarantees.

The Nebraska courts in this case enjoined the publication of certain kinds of information about the *Simants* case. There are, as we suggested earlier, marked differences in setting and purpose between the order entered here and the orders in *Near, Keefe,* and *New York Times,* but as to the underlying issue—the right of the press to be free from *prior* restraints on publication—those

cases form the backdrop against which we must decide this case.

## VI

We turn now to the record in this case to determine whether, as Learned Hand put it, "the gravity of the 'evil,' discounted by its improbability, justifies such invasion of free speech as is necessary to avoid the danger." *United States* v. *Dennis,* 183 F. 2d 201, 212 (CA2 1950), aff'd, 341 U. S. 494 (1951); see also L. Hand, The Bill of Rights 58–61 (1958). To do so, we must examine the evidence before the trial judge when the order was entered to determine (a) the nature and extent of pretrial news coverage; (b) whether other measures would be likely to mitigate the effects of unrestrained pretrial publicity; and (c) how effectively a restraining order would operate to prevent the threatened danger. The precise terms of the restraining order are also important. We must then consider whether the record supports the entry of a prior restraint on publication, one of the most extraordinary remedies known to our jurisprudence.

## A

In assessing the probable extent of publicity, the trial judge had before him newspapers demonstrating that the crime had already drawn intensive news coverage, and the testimony of the County Judge, who had entered the initial restraining order based on the local and national attention the case had attracted. The District Judge was required to assess the probable publicity that would be given these shocking crimes prior to the time a jury was selected and sequestered. He then had to examine the probable nature of the publicity and determine how it would affect prospective jurors.

Our review of the pretrial record persuades us that the trial judge was justified in concluding that there would

be intense and pervasive pretrial publicity concerning this case. He could also reasonably conclude, based on common human experience, that publicity might impair the defendant's right to a fair trial. He did not purport to say more, for he found only "a clear and present danger that pre-trial publicity *could* impinge upon the defendant's right to a fair trial." (Emphasis added.) His conclusion as to the impact of such publicity on prospective jurors was of necessity speculative, dealing as he was with factors unknown and unknowable.

## B

We find little in the record that goes to another aspect of our task, determining whether measures short of an order restraining all publication would have insured the defendant a fair trial. Although the entry of the order might be read as a judicial determination that other measures would not suffice, the trial court made no express findings to that effect; the Nebraska Supreme Court referred to the issue only by implication. See 194 Neb., at 797–798, 236 N. W. 2d, at 803.

Most of the alternatives to prior restraint of publication in these circumstances were discussed with obvious approval in *Sheppard* v. *Maxwell*, 384 U. S., at 357–362: (a) change of trial venue to a place less exposed to the intense publicity that seemed imminent in Lincoln County;[7] (b) postponement of the trial to allow

---

[7] The respondent and intervenors argue here that a change of venue would not have helped, since Nebraska law permits a change only to adjacent counties, which had been as exposed to pretrial publicity in this case as Lincoln County. We have held that state laws restricting venue must on occasion yield to the constitutional requirement that the State afford a fair trial. *Groppi* v. *Wisconsin*, 400 U. S. 505 (1971). We note also that the combined population of Lincoln County and the adjacent counties is over 80,000, providing a substantial pool of prospective jurors.

public attention to subside; (c) searching questioning of prospective jurors, as Mr. Chief Justice Marshall used in the *Burr* case, to screen out those with fixed opinions as to guilt or innocence; (d) the use of emphatic and clear instructions on the sworn duty of each juror to decide the issues only on evidence presented in open court. Sequestration of jurors is, of course, always available. Although that measure insulates jurors only after they are sworn, it also enhances the likelihood of dissipating the impact of pretrial publicity and emphasizes the elements of the jurors' oaths.

This Court has outlined other measures short of prior restraints on publication tending to blunt the impact of pretrial publicity. See *Sheppard* v. *Maxwell, supra,* at 361–362. Professional studies have filled out these suggestions, recommending that trial courts in appropriate cases limit what the contending lawyers, the police, and witnesses may say to anyone. See American Bar Association Project on Standards for Criminal Justice, Fair Trial and Free Press 2–15 (App. Draft 1968).[8]

---

[8] Closing of pretrial proceedings with the consent of the defendant when required is also recommended in guidelines that have emerged from various studies. At oral argument petitioners' counsel asserted that judicially imposed restraints on lawyers and others would be subject to challenge as interfering with press rights to news sources. Tr. of Oral Arg. 7–8. See, *e. g., Chicago Council of Lawyers* v. *Bauer,* 522 F. 2d 242 (CA7 1975), cert. denied *sub nom. Cunningham* v. *Chicago Council of Lawyers, post,* p. 912. We are not now confronted with such issues.

We note that in making its proposals, the American Bar Association recommended strongly against resort to direct restraints on the press to prohibit publication. American Bar Association Project on Standards for Criminal Justice, Fair Trial and Free Press 68–73 (App. Draft 1968). Other groups have reached similar conclusions. See Report of the Judicial Conference Committee on the Operation of the Jury System, "Free Press-Fair Trial" Issue, 45 F. R. D. 391, 401–403 (1968); Special Committee on

We have noted earlier that pretrial publicity, even if pervasive and concentrated, cannot be regarded as leading automatically and in every kind of criminal case to an unfair trial. The decided cases "cannot be made to stand for the proposition that juror exposure to information about a state defendant's prior convictions or to news accounts of the crime with which he is charged alone presumptively deprives the defendant of due process." *Murphy* v. *Florida,* 421 U. S., at 799. Appellate evaluations as to the impact of publicity take into account what other measures were used to mitigate the adverse effects of publicity. The more difficult prospective or predictive assessment that a trial judge must make also calls for a judgment as to whether other precautionary steps will suffice.

We have therefore examined this record to determine the probable efficacy of the measures short of prior restraint on the press and speech. There is no finding that alternative measures would not have protected Simants' rights, and the Nebraska Supreme Court did no more than imply that such measures might not be adequate. Moreover, the record is lacking in evidence to support such a finding.

C

We must also assess the probable efficacy of prior restraint on publication as a workable method of protecting Simants' right to a fair trial, and we cannot ignore the reality of the problems of managing and enforcing pretrial restraining orders. The territorial jurisdiction of the issuing court is limited by concepts of sovereignty, see, *e. g., Hanson* v. *Denckla,* 357 U. S. 235 (1958) ; *Pennoyer* v. *Neff,* 95 U. S. 714 (1878). The need for *in*

---

Radio, Television, and the Administration of Justice of the Association of the Bar of the City of New York, Freedom of the Press and Fair Trial 10–11 (1967).

*personam* jurisdiction also presents an obstacle to a restraining order that applies to publication at large as distinguished from restraining publication within a given jurisdiction.[9] See generally American Bar Association, Legal Advisory Committee on Fair Trial and Free Press, Recommended Court Procedure to Accommodate Rights of Fair Trial and Free Press (Rev. Draft, Nov. 1975); Rendleman, Free Press-Fair Trial: Review of Silence Orders, 52 N. C. L. Rev. 127, 149–155 (1973).[10]

The Nebraska Supreme Court narrowed the scope of the restrictive order, and its opinion reflects awareness of the tensions between the need to protect the accused as fully as possible and the need to restrict publication as little as possible. The dilemma posed underscores how

---

[9] Here, for example, the Nebraska Supreme Court decided that the District Court had no jurisdiction of the petitioners except by virtue of their voluntary submission to the jurisdiction of that court when they moved to intervene. Except for the intervention which placed them within reach of the court, the Nebraska Supreme Court conceded, the petitioners "could have ignored the [restraining] order . . . ." *State* v. *Simants*, 194 Neb. 783, 795, 236 N. W. 2d 794, 802 (1975).

[10] Assuming, *arguendo*, that these problems are within reach of legislative enactment, or that some application of evolving concepts of long-arm jurisdiction would solve the problems of personal jurisdiction, even a cursory examination suggests how awkwardly broad prior restraints on publication, directed not at named parties but at large, would fit into our jurisprudence. The British experience is in sharp contrast for a variety of reasons; Great Britain has a smaller and unitary court system permitting the development of a manageable system of prior restraints by the application of the constructive contempt doctrine. Cf. n. 5, *supra,* at 557; see generally *Maryland* v. *Baltimore Radio Show*, 338 U. S. 912, 921–936 (1950) (App. to opinion of Frankfurter, J., respecting denial of certiorari); Gillmor, Free Press and Fair Trial in English Law, 22 Wash. & Lee L. Rev. 17 (1965). Moreover, any comparison between the two systems must take into account that although England gives a very high place to freedom of the press and speech, its courts are not subject to the explicit strictures of a written constitution.

difficult it is for trial judges to predict what information will in fact undermine the impartiality of jurors, and the difficulty of drafting an order that will effectively keep prejudicial information from prospective jurors. When a restrictive order is sought, a court can anticipate only part of what will develop that may injure the accused. But information not so obviously prejudicial may emerge, and what may properly be published in these "gray zone" circumstances may not violate the restrictive order and yet be prejudicial.

Finally, we note that the events disclosed by the record took place in a community of 850 people. It is reasonable to assume that, without any news accounts being printed or broadcast, rumors would travel swiftly by word of mouth. One can only speculate on the accuracy of such reports, given the generative propensities of rumors; they could well be more damaging than reasonably accurate news accounts. But plainly a whole community cannot be restrained from discussing a subject intimately affecting life within it.

Given these practical problems, it is far from clear that prior restraint on publication would have protected Simants' rights.

## D

Finally, another feature of this case leads us to conclude that the restrictive order entered here is not supportable. At the outset the County Court entered a very broad restrictive order, the terms of which are not before us; it then held a preliminary hearing open to the public and the press. There was testimony concerning at least two incriminating statements made by Simants to private persons; the statement—evidently a confession—that he gave to law enforcement officials was also introduced. The State District Court's later order was entered after this public hearing and, as modified by the

Nebraska Supreme Court, enjoined reporting of (1) "[c]onfessions or admissions against interest made by the accused to law enforcement officials"; (2) "[c]onfessions or admissions against interest, oral or written, if any, made by the accused to third parties, excepting any statements, if any, made by the accused to representatives of the news media"; and (3) all "[o]ther information strongly implicative of the accused as the perpetrator of the slayings." 194 Neb., at 801, 236 N. W. 2d, at 805.

To the extent that this order prohibited the reporting of evidence adduced at the open preliminary hearing, it plainly violated settled principles: "[T]here is nothing that proscribes the press from reporting events that transpire in the courtroom." *Sheppard* v. *Maxwell*, 384 U. S., at 362–363. See also *Cox Broadcasting Corp.* v. *Cohn*, 420 U. S. 469 (1975); *Craig* v. *Harney*, 331 U. S. 367 (1947). The County Court could not know that closure of the preliminary hearing was an alternative open to it until the Nebraska Supreme Court so construed state law; but once a public hearing had been held, what transpired there could not be subject to prior restraint.

The third prohibition of the order was defective in another respect as well. As part of a final order, entered after plenary review, this prohibition regarding "implicative" information is too vague and too broad to survive the scrutiny we have given to restraints on First Amendment rights. See, *e. g., Hynes* v. *Mayor of Oradell*, 425 U. S. 610 (1976); *Buckley* v. *Valeo*, 424 U. S. 1, 76–82 (1976); *NAACP* v. *Button*, 371 U. S. 415 (1963). The third phase of the order entered falls outside permissible limits.

E

The record demonstrates, as the Nebraska courts held, that there was indeed a risk that pretrial news accounts,

true or false, would have some adverse impact on the attitudes of those who might be called as jurors. But on the record now before us it is not clear that further publicity, unchecked, would so distort the views of potential jurors that 12 could not be found who would, under proper instructions, fulfill their sworn duty to render a just verdict exclusively on the evidence presented in open court. We cannot say on this record that alternatives to a prior restraint on petitioners would not have sufficiently mitigated the adverse effects of pretrial publicity so as to make prior restraint unnecessary. Nor can we conclude that the restraining order actually entered would serve its intended purpose. Reasonable minds can have few doubts about the gravity of the evil pretrial publicity can work, but the probability that it would do so here was not demonstrated with the degree of certainty our cases on prior restraint require.

Of necessity our holding is confined to the record before us. But our conclusion is not simply a result of assessing the adequacy of the showing made in this case; it results in part from the problems inherent in meeting the heavy burden of demonstrating, in advance of trial, that without prior restraint a fair trial will be denied. The practical problems of managing and enforcing restrictive orders will always be present. In this sense, the record now before us is illustrative rather than exceptional. It is significant that when this Court has reversed a state conviction because of prejudicial publicity, it has carefully noted that some course of action short of prior restraint would have made a critical difference. See *Sheppard* v. *Maxwell, supra,* at 363; *Estes* v. *Texas,* 381 U. S., at 550–551; *Rideau* v. *Louisiana,* 373 U. S., at 726; *Irvin* v. *Dowd,* 366 U. S., at 728. However difficult it may be, we need not rule out the possibility of showing the kind of threat to fair trial rights that would possess

the requisite degree of certainty to justify restraint. This Court has frequently denied that First Amendment rights are absolute and has consistently rejected the proposition that a prior restraint can never be employed. See *New York Times Co.* v. *United States,* 403 U. S. 713 (1971); *Organization for a Better Austin* v. *Keefe,* 402 U. S. 415 (1971); *Near* v. *Minnesota ex rel. Olson,* 283 U. S. 697 (1931).

Our analysis ends as it began, with a confrontation between prior restraint imposed to protect one vital constitutional guarantee and the explicit command of another that the freedom to speak and publish shall not be abridged. We reaffirm that the guarantees of freedom of expression are not an absolute prohibition under all circumstances, but the barriers to prior restraint remain high and the presumption against its use continues intact. We hold that, with respect to the order entered in this case prohibiting reporting or commentary on judicial proceedings held in public, the barriers have not been overcome; to the extent that this order restrained publication of such material, it is clearly invalid. To the extent that it prohibited publication based on information gained from other sources, we conclude that the heavy burden imposed as a condition to securing a prior restraint was not met and the judgment of the Nebraska Supreme Court is therefore

*Reversed.*

MR. JUSTICE WHITE, concurring.

Technically there is no need to go farther than the Court does to dispose of this case, and I join the Court's opinion. I should add, however, that for the reasons which the Court itself canvasses there is grave doubt in my mind whether orders with respect to the press such as were entered in this case would ever be justifi-

able.  It may be the better part of discretion, however, not to announce such a rule in the first case in which the issue has been squarely presented here.  Perhaps we should go no further than absolutely necessary until the federal courts, and ourselves, have been exposed to a broader spectrum of cases presenting similar issues.  If the recurring result, however, in case after case is to be similar to our judgment today, we should at some point announce a more general rule and avoid the interminable litigation that our failure to do so would necessarily entail.

MR. JUSTICE POWELL, concurring.

Although I join the opinion of the Court, in view of the importance of the case I write to emphasize the unique burden that rests upon the party, whether it be the State or a defendant, who undertakes to show the necessity for prior restraint on pretrial publicity.*

In my judgment a prior restraint properly may issue only when it is shown to be necessary to prevent the dissemination of prejudicial publicity that otherwise poses a high likelihood of preventing, directly and irreparably, the impaneling of a jury meeting the Sixth Amendment requirement of impartiality.  This requires a showing that (i) there is a clear threat to the fairness of trial, (ii) such a threat is posed by the actual publicity to be restrained, and (iii) no less restrictive alternatives are available.  Notwithstanding such a showing, a restraint may not issue unless it also is shown that previous publicity or publicity from unrestrained sources will not render the restraint inefficacious.  The threat to the fair-

---

*In *Times-Picayune Pub. Corp.* v. *Schulingkamp,* 419 U. S. 1301, 1307 (1974), an in-chambers opinion, I noted that there is a heavy presumption against the constitutional validity of a court order restraining pretrial publicity.

ness of the trial is to be evaluated in the context of Sixth Amendment law on impartiality, and any restraint must comply with the standards of specificity always required in the First Amendment context.

I believe these factors are sufficiently addressed in the Court's opinion to demonstrate beyond question that the prior restraint here was impermissible.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE STEWART and MR. JUSTICE MARSHALL join, concurring in the judgment.

The question presented in this case is whether, consistently with the First Amendment, a court may enjoin the press, in advance of publication,[1] from reporting or commenting on information acquired from public court proceedings, public court records, or other sources about pending judicial proceedings. The Nebraska Supreme Court upheld such a direct prior restraint on the press, issued by the judge presiding over a sensational state murder trial, on the ground that there existed a "clear and present danger that pretrial publicity could substantially impair the right of the defendant [in the murder trial] to a trial by an impartial jury unless restraints were imposed." *State* v. *Simants,* 194 Neb. 783, 794, 236 N. W. 2d 794, 802 (1975). The right to a fair trial by a jury of one's peers is unquestionably one of the most precious and sacred safeguards enshrined in the Bill of Rights. I would hold, however, that resort to prior restraints on the freedom of the press is a constitutionally impermissible method for enforcing that right; judges have at their disposal a broad spectrum of devices for ensuring that fundamental fairness is accorded the

---

[1] In referring to the "press" and to "publication" in this opinion, I of course use those words as terms of art that encompass broadcasting by the electronic media as well.

accused without necessitating so drastic an incursion on the equally fundamental and salutary constitutional mandate that discussion of public affairs in a free society cannot depend on the preliminary grace of judicial censors.

I

The history of the current litigation highlights many of the dangers inherent in allowing any prior restraint on press reporting and commentary concerning the operations of the criminal justice system.

This action arose out of events surrounding the prosecution of respondent-intervenor Simants for the premeditated mass murder of the six members of the Kellie family in Sutherland, Neb., on October 18, 1975. Shortly after the crimes occurred, the community of 850 was alerted by a special announcement over the local television station. Residents were requested by the police to stay off the streets and exercise caution as to whom they admitted into their houses, and rumors quickly spread that a sniper was loose in Sutherland. When an investigation implicated Simants as a suspect, his name and description were provided to the press and then disseminated to the public.

Simants was apprehended on the morning of October 19, charged with six counts of premeditated murder, and arraigned before the County Court of Lincoln County, Neb. Because several journalists were in attendance and "proof concerning bail . . . would be prejudicial to the rights of the defendant to later obtain a fair trial," App. 7, a portion of the bail hearing was closed, over Simants' objection, pursuant to the request of the Lincoln County Attorney. At the hearing, counsel was appointed for Simants, bail was denied, and October 22 was set as the date for a preliminary hearing to determine whether Simants should be bound over for trial in

the District Court of Lincoln County, Neb. News of Simants' apprehension, which was broadcast over radio and television and reported in the press, relieved much of the tension that had built up during the night. During the period from October 19 until the first restrictive order was entered three days later, representatives of the press made accurate factual reports of the events that transpired, including reports of incriminating statements made by Simants to various relatives.

On the evening of October 21, the prosecution filed a motion that the County Court issue a restrictive order enjoining the press from reporting significant aspects of the case. The motion, filed without further evidentiary support, stated:

"The State of Nebraska hereby represents unto the Court that *by reason of the nature of the above-captioned case,* there has been, and no doubt there will continue to be, mass coverage by news media not only locally but nationally as well; that a preliminary hearing on the charges has been set to commence at 9:00 a. m. on October 22, 1975; and there is *a reasonable likelihood of prejudicial news which would make difficult, if not impossible, the impaneling of an impartial jury* and tend to prevent a fair trial should the defendant be bound over to trial in the District Court if testimony of witnesses at the preliminary hearing is reported to the public.

"Wherefore the State of Nebraska moves that the Court forthwith enter a Restrictive Order setting forth the matters that may or may not be publicly reported or disclosed to the public with reference to said case or with reference to the preliminary hearing thereon, and to whom said order shall apply." App. 8. (Emphasis supplied.)

Half an hour later, the County Court Judge heard

argument on the prosecution motion. Defense counsel joined in urging imposition of a restrictive order, and further moved that the preliminary hearing be closed to both the press and the public. No representatives of the media were notified of or called to testify at the hearing, and no evidence of any kind was introduced.

On October 22, when the autopsy results were completed, the County Attorney filed an amended complaint charging that the six premeditated murders had been committed by Simants in conjunction with the perpetration of or attempt to perpetrate a sexual assault. About the same time, at the commencement of the preliminary hearing, the County Court entered a restrictive order premised on its finding that there was "a reasonable likelihood of prejudicial news which would make difficult, if not impossible, the impaneling of an impartial jury in the event that the defendant is bound over to the District Court for trial . . . ." Amended Pet. for Cert. 1a. Accordingly, the County Court ordered that all parties to the case, attorneys, court personnel, public officials, law enforcement officials, witnesses, and "any other person present in Court" during the preliminary hearing, were not to "release or authorize the release for public dissemination in any form or manner whatsoever any testimony given or evidence adduced during the preliminary hearing." *Id.,* at 2a. The court further ordered that no law enforcement official, public officer, attorney, witness, or "news media" "disseminate any information concerning this matter apart from the preliminary hearing other than as set forth in the Nebraska Bar-Press Guidelines for Disclosure and Reporting of Information Relating to Imminent or Pending Criminal Litigation." *Ibid.*[2] The order was to

---

[2] A copy of the "Nebraska Bar-Press Guidelines," ostensibly a voluntary code formulated by representatives of the media and the

remain in effect "until modified or rescinded by a higher court or until the defendant is ordered released from these charges." *Id.*, at 3a. The court also denied the defense request to close the preliminary hearing,[3] and an open hearing was then held, at which time various witnesses testified, disclosing significant factual information concerning the events surrounding the alleged crimes. Upon completion of the hearing, the County Court bound the defendant over for trial in the District Court, since it found that the offenses charged in the indictment had been committed, and that there was probable cause to believe that Simants had committed them.

The next day, petitioners—Nebraska newspaper publishers, broadcasters, journalists, and media associations,

---

bar, was attached to the order. The Guidelines, which are similar to voluntary codes adhered to by the press in several States, are attached as an appendix to this opinion.

Excepted from the scope of the County Court's order were: (1) factual statements of the accused's name, age, residence, occupation, and family status; (2) the circumstances of the arrest (time and place, identity of the arresting and investigating officers and agencies, and the length of the investigation); (3) the nature, substance, and text of the charge; (4) quotations from, or any reference without comment to, public records or communications heretofore disseminated to the public; (5) the scheduling and result of any stage of the judicial proceeding held in open court; (6) a request for assistance in obtaining evidence; and (7) a request for assistance in obtaining the names of possible witnesses. The court also ordered that a copy of the preliminary hearing proceedings was to be made available to the public at the expiration of the order.

[3] The court apparently believed that a public preliminary hearing was required by state law. The Nebraska Supreme Court subsequently held that the pertinent state statute did not require that pretrial hearings be open to the public. Both petitioners and the State of Nebraska agree that the question whether preliminary hearings may be closed to the public consistently with the "Public Trial" Clause of the Sixth Amendment is not before us, and it is therefore one on which I would express no views.

and national newswire services that report from and to Nebraska—sought leave from the District Court to intervene in the criminal case and vacation of the County Court's restrictive order as repugnant to the First and Sixth Amendments to the United States Constitution as well as relevant provisions of the Nebraska Constitution. Simants' attorney moved that the order be continued and that future pretrial hearings in the case be closed. The District Court then held an evidentiary hearing, after which it denied the motion to close any hearings, granted petitioners' motion to intervene, and adopted on an interim basis the County Court's restrictive order. The only testimony adduced at the hearing with respect to the need for the restrictive order was that of the County Court Judge, who stated that he had premised his order on his awareness of media publicity, "[c]onversation around the courthouse," and "statements of counsel." App. 64, 65. In addition, several newspaper clippings pertaining to the case were introduced as exhibits before the District Court.

Without any further hearings, the District Court on October 27 terminated the County Court's order and substituted its own. The court found that *"because of the nature of the crimes charged* in the complaint . . . there is a *clear and present danger* that pre-trial publicity *could impinge upon the defendant's right to a fair trial* and that an order setting forth the limitations of pre-trial publicity is appropriate . . . ." Amended Pet. for Cert. 9a (emphasis supplied). Respondent Stuart, the District Court Judge, then "adopted" as his order the Nebraska Bar-Press Guidelines as "clarified" by him in certain respects.[4]

---

[4] The Nebraska Bar-Press Guidelines, see appendix to this opinion, were "clarified" as follows, Amended Pet. for Cert. 10a–11a: "1. It is hereby stated the trial of the case commences when a

On October 31, petitioners sought a stay of the order from the District Court and immediate relief from the Nebraska Supreme Court by way of mandamus, stay, or expedited appeal. When neither the District Court nor the Nebraska Supreme Court acted on these mo-

jury is empaneled to try the case, and that all reporting prior to that event, specifically including the preliminary hearing is 'pre-trial' publicity.

"2. It would appear that defendant has made a statement or confession to law enforcement officials and it is inappropriate to report the existence of such statement or the contents of it.

"3. It appears that the defendant may have made statements against interest to James Robert Boggs, Amos Simants and Grace Simants, and may have left a note in the William Boggs residence, and that the nature of such statements, or the fact that such statements were made, or the nature of the testimony of these witnesses with reference to such statements in the preliminary hearing will not be reported.

"4. The non-technical aspects of the testimony of Dr. Miles Foster may be reported within the guidelines and at the careful discretion of the press. The testimony of this witness dealing with technical subjects, tests or investigations performed or the results thereof, or his opinions or conclusions as a result of such tests or investigations will not be reported.

"5. The general physical facts found at the scene of the crime may be reported within the guidelines and at the careful discretion of the press. However, the identity of the person or persons allegedly sexually assaulted or the details of any alleged assault by the defendant will not be reported.

"6. The exact nature of the limitations of publicity as entered by this order will not be reported. That is to say, the fact of the entering of this order limiting pre-trial publicity and the adoption of the Bar-Press Guidelines may be reported, but specific reference to confessions, statements against interest, witnesses or type of evidence to which this order will apply will not be reported."

An additional portion of the order relating to the press' accommodations in the courtroom and the taking of photographs in the courthouse was not contested below and is not before this Court. The full order, including its references to confessions, was read in open court.

tions, petitioners on November 5 applied to MR. JUSTICE BLACKMUN, as Circuit Justice, for a stay of the District Court's order. Five days later, the Nebraska Supreme Court issued a *per curiam* statement that to avoid being put in the position of "exercising parallel jurisdiction with the Supreme Court of the United States," it would continue the matter until this Court "made known whether or not it will accept jurisdiction in the matter." *Id.,* at 19a–20a.

On November 13, MR. JUSTICE BLACKMUN filed an in-chambers opinion in which he declined to act on the stay "at least for the immediate present." 423 U. S. 1319, 1326. He observed: "[I]f no action on the [petitioners'] application to the Supreme Court of Nebraska could be anticipated before December 1, [as was indicated by a communication from that court's clerk before the court issued the *per curiam* statement,] . . . a definitive decision by the State's highest court on an issue of profound constitutional implications, demanding immediate resolution, would be delayed for a period so long that the very day-to-day duration of that delay would constitute and aggravate a deprival of such constitutional rights, if any, that the [petitioners] possess and may properly assert. Under those circumstances, I would not hesitate promptly to act." *Id.,* at 1324–1325. However, since the Nebraska Supreme Court had indicated in its *per curiam* statement that it was only declining to act because of uncertainty as to what this Court would do, and since it was deemed appropriate for the state court to pass initially on the validity of the restrictive order, MR. JUSTICE BLACKMUN, "without prejudice to the [petitioners] to reapply to me should prompt action not be forthcoming," *id.,* at 1326, denied the stay "[o]n the expectation . . . that the Supreme Court of Nebraska, forthwith and without delay will entertain the

[petitioners'] application made to it, and will promptly decide it in the full consciousness that 'time is of the essence.' " *Id.,* at 1325.

When, on November 18, the Supreme Court of Nebraska set November 25 as the date to hear arguments on petitioners' motions, petitioners reapplied to MR. JUSTICE BLACKMUN for relief. On November 20, MR. JUSTICE BLACKMUN, concluding that each passing day constituted an irreparable infringement on First Amendment values and that the state courts had delayed adjudication of petitioners' claims beyond "tolerable limits," 423 U. S. 1327, 1329, granted a partial stay of the District Court's order. First, the "wholesale incorporation" of the Nebraska Bar-Press Guidelines was stayed on the ground that they "constitute a 'voluntary code' which was not intended to be mandatory" and which was "sufficiently riddled with vague and indefinite admonitions—understandably so in view of the basic nature of 'guidelines,' " that they did "not provide the substance of a permissible court order in the First Amendment area." *Id.,* at 1330, 1331. However, the state courts could "reimpose particular provisions included in the Guidelines so long as they are deemed pertinent to the facts of this particular case and so long as they are adequately specific and in keeping with the remainder of this order." *Id.,* at 1331. Second, the portion of the District Court order prohibiting reporting of the details of the crimes, the identities of the victims, and the pathologist's testimony at the preliminary hearing was stayed because there was "[n]o persuasive justification" for the restraint; such "facts in themselves do not implicate a particular putative defendant," *ibid.,* and "until the bare facts concerning the crimes are related to a particular accused, . . . their being reported in the media [does not appear to] irreparably infringe the accused's right

to a fair trial of the issue as to whether he was the one who committed the crimes." *Id.*, at 1332. Third, believing that prior restraints of this kind "are not necessarily and in all cases invalid," MR. JUSTICE BLACK-MUN concluded that "certain facts that strongly implicate an accused may be restrained from publication by the media prior to his trial. A confession or statement against interest is the paradigm," *id.*, at 1332–1333, and other such facts would include "those associated with the circumstances of his arrest," those "that are not necessarily implicative, but that are highly prejudicial, as, for example, facts associated with the accused's criminal record, if he has one," and "statements as to the accused's guilt by those associated with the prosecution." *Id.*, at 1333.[5] Finally, the restrictive order's limitation on disclosure of the nature of the limitations themselves was stayed "to the same extent" as the limitations. *Ibid.*[6]

The following day petitioners filed a motion that the Court vacate MR. JUSTICE BLACKMUN's order to the extent it permitted the imposition of any prior restraint on publication. Meanwhile, on November 25, the Supreme Court of Nebraska heard oral argument as sched-

---

[5] MR. JUSTICE BLACKMUN's view of the burden of proof for imposing such restraints was as follows: "The accused, and the prosecution if it joins him, bears the burden of showing that publicizing particular facts will irreparably impair the ability of those exposed to them to reach an independent and impartial judgment as to guilt." 423 U. S., at 1333.

[6] The in-chambers opinion also stayed any prohibition concerning reporting of the pending application for relief in the Supreme Court of Nebraska, but permitted a prohibition of reporting of the two in-chambers opinions to the extent they contained "facts properly suppressed." *Id.*, at 1334. Nothing in the opinion was to be "deemed as barring what the District Judge may impose by way of restriction on what the parties and officers of the court may say to any representative of the media." *Ibid.*

uled, and on December 1 filed a *per curiam* opinion.[7] Initially, the court held that it was improper for petitioners or any other third party to intervene in a criminal case, and that the appeal from that case must therefore be denied. However, the court concluded that it had judisdiction over petitioners' mandamus action against respondent Stuart, and that respondents Simants and State of Nebraska had properly intervened in that action.[8] Addressing the merits of the prior restraint issued by the District Court, the Nebraska Supreme Court acknowledged that this Court "has not yet had occasion to speak definitively where a clash between these two preferred rights [the First Amendment freedom of speech and of the press and the Sixth Amendment right to trial by an impartial jury] was sought to be accommodated by a prior restraint on freedom of the press." 194 Neb., at 791, 236 N. W. 2d, at 800. However, relying on dictum in *Branzburg v. Hayes,* 408 U. S. 665 (1972),[9] and our statement in *New York Times Co. v. United States,* 403 U. S. 713 (1971), that a prior restraint on the

---

[7] Two justices of the Supreme Court of Nebraska dissented on jurisdictional grounds similar to those that formed the predicate for that court's earlier *per curiam* statement, and two other justices who agreed with those jurisdictional claims nevertheless joined the *per curiam* to avoid a procedural deadlock.

[8] These rulings resulted in the paradoxical situation that "[petitioners] could have ignored the [County Court's] order" because that court had not obtained personal jurisdiction over them and because "courts have no general power in any kind of case to enjoin or restrain 'everybody,'" *State v. Simants,* 194 Neb. 783, 795, 236 N. W. 2d 794, 802 (1975). However, because they had improperly intervened in the criminal case (from which they could not appeal), a prior restraint could issue against them. Indeed, the court noted that the prior restraint "applies only to [petitioners]" and not to any other organs of the media. *Id.,* at 788, 236 N. W. 2d, at 798.

[9] See n. 21, *infra.*

media bears " 'a heavy presumption against its constitutional validity,' " *id.,* at 714, the court discerned an "implication" "that if there is only a presumption of unconstitutionality then there must be some circumstances under which prior restraints may be constitutional for otherwise there is no need for a mere presumption." 194 Neb., at 793, 236 N. W. 2d, at 801. The court then concluded that there was evidence "to overcome the heavy presumption" in that the State's obligation to accord Simants an impartial jury trial "may be impaired" by pretrial publicity and that pretrial publicity "might make it difficult or impossible" to accord Simants a fair trial. *Id.,* at 794, 797, 236 N. W. 2d, at 802, 803.[10] Accordingly, the court held, *id.,* at 801, 236 N. W. 2d, at 805:

> "[T]he order of the District Court of October 27, 1975, is void insofar as it incorporates the voluntary guidelines and in certain other respects in that it impinges too greatly upon freedom of the press. The guidelines were not intended to be contractual and cannot be enforced as if they were.
>
> "The order of the District Court of October 27, 1975, is vacated and is modified and reinstated in the

---

[10] The evidence relied on by the Nebraska Supreme Court included the following: The fact that before entry of the restrictive order, certain newspapers had reported information "which, if true, tended clearly to connect the accused with the slayings," 194 Neb., at 796, 236 N. W. 2d, at 802; the fact that "counsel for the media stated that it is already doubtful that an unbiased jury can be found to hear the Simants case in Lincoln County," *id.,* at 797, 236 N. W. 2d, at 803; the fact that Nebraska law required the trial to transpire within six months of the date the information was filed, *ibid.;* the relatively small population of the counties to which Nebraska law would permit a change of venue, *id.,* at 797–798, 236 N. W. 2d, at 803; the "mere heinousness or enormity of a crime"; and "the trial court's own knowledge of the surrounding circumstances," *id.,* at 798, 236 N. W. 2d, at 803.

following respects: It shall be effective only as to events which have occurred prior to the filing of this opinion, and only as it applies to the relators herein, and only insofar as it restricts publication of the existence or content of the following, if any such there be: (1) Confessions or admissions against interest made by the accused to law enforcement officials. (2) Confessions or admissions against interest, oral or written, if any, made by the accused to third parties, excepting any statements, if any, made by the accused to representatives of the news media. (3) Other information strongly implicative of the accused as the perpetrator of the slayings." [11]

On December 4 petitioners applied to this Court for a stay of that order and moved that their previously filed papers be treated as a petition for a writ of certiorari. On December 8, we granted the latter motion and deferred consideration of the petition for a writ and application for a stay pending responses from respondents on the close of business the following day. 423 U. S. 1011.[12] On December 12, we granted the petition for a writ of certiorari, denied the motion to expedite, and denied the application for a stay. 423 U. S. 1027.[13]

---

[11] The Nebraska Supreme Court also "adopted" American Bar Association Project on Standards for Criminal Justice, Fair Trial and Free Press § 3.1, Pretrial Hearings (App. Draft 1968), which provides for exclusion of the press and public from pretrial hearings under certain circumstances, and remanded the case to the District Court to consider any applications to close future pretrial proceedings under that standard. The constitutionality of closing pretrial proceedings under specific conditions is not before us, and is a question on which I would intimate no views.

[12] JUSTICES STEWART and MARSHALL and I noted that we would have granted the application for a stay.

[13] JUSTICES STEWART and MARSHALL and I dissented from denial of the motions to expedite and to grant a stay; MR. JUS-

## II

### A

The Sixth Amendment to the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . . ." The right to a jury trial, applicable to the States through the Due Process Clause of the Fourteenth Amendment, see, *e. g.*, *Duncan* v. *Louisiana*, 391 U. S. 145 (1968), is essentially

TICE WHITE dissented from the latter motion to the extent the state courts had prohibited the reporting of information publicly disclosed during the preliminary hearing in the underlying criminal proceeding.

Although the order of the Nebraska Supreme Court expired when the jury in *State* v. *Simants* was impaneled and sequestered on January 7, 1976, this case is not moot. This is a paradigmatic situation of "short term orders, capable of repetition, yet evading review." *E. g.*, *Southern Pacific Terminal Co.* v. *ICC*, 219 U. S. 498, 515 (1911). It is evident that the decision of the Nebraska Supreme Court will subject petitioners to future restrictive orders with respect to pretrial publicity, and that the validity of these orders, which typically expire when the jury is sequestered, generally cannot be fully litigated within that period of time. See, *e. g.*, *Weinstein* v. *Bradford*, 423 U. S. 147, 149 (1975). See also *Carroll* v. *Princess Anne*, 393 U. S. 175, 178–179 (1968).

Counsel informs us that Simants has subsequently been tried, convicted, and sentenced to death, and that his appeal is currently pending in the Nebraska Supreme Court. Simants' defense rested on a plea of not guilty by reason of insanity, and all of the information which remained unreported during the pretrial period was ultimately received in evidence. The trial judge also declined to close further pretrial hearings, granted Simants' requests to sequester the jury and conduct *voir dire* with no more than four prospective jurors present at one time, and denied Simants' request for a change of venue. A *Jackson* v. *Denno* (378 U. S. 368 (1964)) hearing and the first day of *voir dire* were also closed to the public. Petitioners have challenged the latter rulings, and that litigation is still pending in the state courts.

the right to a "fair trial by a panel of impartial, 'indifferent' jurors," *Irvin* v. *Dowd,* 366 U. S. 717, 722 (1961), jurors who are " 'indifferent as [they] stand unsworn.' " *Reynolds* v. *United States,* 98 U. S. 145, 154 (1879), quoting E. Coke, A Commentary upon Littleton 155*b* (19th ed. 1832). See also, *e. g., Ristaino* v. *Ross,* 424 U. S. 589, 597 n. 9 (1976); *Rideau* v. *Louisiana,* 373 U. S. 723 (1963); *Irvin* v. *Dowd, supra,* at 722; *In re Murchison,* 349 U. S. 133, 136 (1955); *In re Oliver,* 333 U. S. 257 (1948). So basic to our jurisprudence is the right to a fair trial that it has been called "the most fundamental of all freedoms." *Estes* v. *Texas,* 381 U. S. 532, 540 (1965). It is a right essential to the preservation and enjoyment of all other rights, providing a necessary means of safeguarding personal liberties against government oppression. See, *e. g., Rideau* v. *Louisiana, supra,* at 726–727. See generally *Duncan* v. *Louisiana, supra,* at 149–158.

The First Amendment to the United States Constitution, however, secures rights equally fundamental in our jurisprudence, and its ringing proclamation that "Congress shall make no law . . . abridging the freedom of speech, or of the press . . ." has been both applied through the Fourteenth Amendment to invalidate restraints on freedom of the press imposed by the States, see, *e. g., Miami Herald Publishing Co.* v. *Tornillo,* 418 U. S. 241 (1974); *New York Times Co.* v. *Sullivan,* 376 U. S. 254 (1964); *Near* v. *Minnesota ex rel. Olson,* 283 U. S. 697 (1931), and interpreted to interdict such restraints imposed by the courts, see, *e. g., New York Times Co.* v. *United States,* 403 U. S. 713 (1971); *Craig* v. *Harney,* 331 U. S. 367 (1947); *Bridges* v. *California,* 314 U. S. 252 (1941). Indeed, it has been correctly perceived that a "responsible press has always been regarded as the handmaiden of effective judicial administration, especially in the criminal field. . . . The

press does not simply publish information about trials but guards against the miscarriage of justice by subjecting the police, prosecutors, and judicial processes to extensive public scrutiny and criticism." *Sheppard* v. *Maxwell,* 384 U. S. 333, 350 (1966). See also, *e. g., Cox Broadcasting Corp.* v. *Cohn,* 420 U. S. 469, 491–496 (1975). Commentary and reporting on the criminal justice system is at the core of First Amendment values, for the operation and integrity of that system is of crucial import to citizens concerned with the administration of government. Secrecy of judicial action can only breed ignorance and distrust of courts and suspicion concerning the competence and impartiality of judges; free and robust reporting, criticism, and debate can contribute to public understanding of the rule of law and to comprehension of the functioning of the entire criminal justice system, as well as improve the quality of that system by subjecting it to the cleansing effects of exposure and public accountability. See, *e. g., In re Oliver, supra,* at 270–271; L. Brandeis, Other People's Money 62 (1933) ("Sunlight is said to be the best of disinfectants; electric light the most efficient policeman").

No one can seriously doubt, however, that uninhibited prejudicial pretrial publicity may destroy the fairness of a criminal trial, see, *e. g., Sheppard* v. *Maxwell, supra,* and the past decade has witnessed substantial debate, colloquially known as the Free Press/Fair Trial controversy, concerning this interface of First and Sixth Amendment rights. In effect, we are now told by respondents that the two rights can no longer coexist when the press possesses and seeks to publish "confessions or admissions against interest" and other information "strongly implicative" [14] of a criminal defendant as the

---

[14] The precise scope of these terms is not, of course, self-evident. Almost any statement may be an "admission against interest" if, for

perpetrator of a crime, and that one or the other right must therefore be subordinated. I disagree. Settled case law concerning the impropriety and constitutional invalidity of prior restraints on the press compels the conclusion that there can be no prohibition on the publication by the press of any information pertaining to pending judicial proceedings or the operation of the criminal justice system, no matter how shabby the means by which the information is obtained.[15] This does not imply, however, any subordination of Sixth Amendment rights, for an accused's right to a fair trial may be adequately assured through methods that do not infringe First Amendment values.

## B

"[I]t has been generally, if not universally, considered that it is the chief purpose of the [First Amendment's] guaranty to prevent previous restraints upon publica-

---

example, it can be shown to be false and thus destructive of the accused's credibility. This would even be true with respect to exculpatory statements made by an accused, such as those relating to alleged alibi defenses. Similarly, there is considerable vagueness in the phrase "strongly implicative" of the accused's guilt. The Nebraska Supreme Court did not elaborate on its meaning, and counsel for the State suggests it only covers the existence of the accused's prior criminal record, if any. Tr. of Oral Arg. 54. Others might view the phrase considerably more expansively. See *supra*, at 581; cf. 194 Neb., at 789–790, 236 N. W. 2d, at 799. Indeed, even the fact the accused was indicted might be viewed as "strongly implicative" of his guilt by reporters not schooled in the law, and the threat of contempt for transgression of such directives would thus tend to self-censorship even as to materials not intended to be covered by the restrictive order.

[15] Of course, even if the press cannot be enjoined from reporting certain information, that does not necessarily immunize it from civil liability for libel or invasion of privacy or from criminal liability for transgressions of general criminal laws during the course of obtaining that information.

tion." *Near* v. *Minnesota ex rel. Olson,* 283 U. S., at 713. See also, *e. g., id.,* at 716–717; *Patterson* v. *Colorado ex rel. Attorney General,* 205 U. S. 454, 462 (1907); *Grosjean* v. *American Press Co.,* 297 U. S. 233, 249 (1936).[16] Prior restraints are "the essence of censorship," *Near* v. *Minnesota ex rel. Olson, supra,* at 713, and "[o]ur distaste for censorship—reflecting the natural distaste of a free people—is deep-written in our law." *Southeastern Promotions, Ltd.* v. *Conrad,* 420 U. S. 546, 553 (1975). The First Amendment thus accords greater protection against prior restraints than it does against subsequent punishment for a particular speech, see, *e. g., Carroll* v. *Princess Anne,* 393 U. S. 175, 180–181 (1968); *Near* v. *Minnesota ex rel. Olson, supra;* "a free society prefers to punish the few who abuse rights of speech *after* they break the law than to throttle them and all others beforehand. It is always difficult to know in advance what an individual will say, and the line between legitimate and illegitimate speech is often so finely drawn that the risks of free-wheeling censorship are formidable." *Southeastern Promotions, Ltd.* v. *Conrad, supra,* at 559. A commentator has cogently summarized many of the reasons for this deep-seated American hostility to prior restraints:

> "A system of prior restraint is in many ways more inhibiting than a system of subsequent punishment: It is likely to bring under government scrutiny a far wider range of expression; it shuts off communication before it takes place; suppression by a stroke of the pen is more likely to be applied than suppression through a criminal process; the procedures

---

[16] The only criticism of this statement is that it does not embrace all of the protection accorded freedom of speech and of the press by the First Amendment. See, *e. g., Near* v. *Minnesota ex rel. Olson,* 283 U. S., at 714–715.

do not require attention to the safeguards of the criminal process; the system allows less opportunity for public appraisal and criticism; the dynamics of the system drive toward excesses, as the history of all censorship shows." T. Emerson, The System of Freedom of Expression 506 (1970).[17]

Respondents correctly contend that "the [First Amendment] protection even as to previous restraint is not absolutely unlimited." *Near* v. *Minnesota ex rel. Olson, supra,* at 716. However, the exceptions to the rule have been confined to "exceptional cases." *Ibid.* The Court in *Near,* the first case in which we were faced with a prior restraint against the press, delimited three such possible exceptional circumstances. The first two exceptions were that "the primary requirements of decency may be enforced against obscene publications," and that "[t]he security of the community life may be protected against incitements to acts of violence and the overthrow by force of orderly government [for] [t]he constitutional guaranty of free speech does not 'protect a man from an injunction against uttering words that may have all the effect of force. . . .' " *Ibid.* These exceptions have since come to be interpreted as situations in which the "speech" involved is not encompassed within the meaning of the First Amendment. See, *e. g., Roth* v. *United States,* 354 U. S. 476, 481 (1957); *Miller* v. *California,* 413 U. S. 15 (1973); *Chaplinsky* v. *New Hampshire,* 315 U. S. 568 (1942). See also *New York Times Co.* v. *United States,* 403 U. S., at 726 n. (BRENNAN, J., concurring); *id.,* at 731 n. 1 (WHITE, J., concurring).

---

[17] Thus the First Amendment constitutes a direct repudiation of the British system of licensing. See, *e. g., Near* v. *Minnesota ex rel. Olson, supra,* at 713–714; *Grosjean* v. *American Press Co.,* 297 U. S. 233, 245–250 (1936); *Bridges* v. *California,* 314 U. S. 252, 263–264 (1941); *Wood* v. *Georgia,* 370 U. S. 375, 384, and n. 5 (1962).

And even in these situations, adequate and timely procedures are mandated to protect against any restraint of speech that does come within the ambit of the First Amendment. See, *e. g.*, *Southeastern Promotions, Ltd.* v. *Conrad, supra; United States* v. *Thirty-seven Photographs*, 402 U. S. 363 (1971); *Freedman* v. *Maryland*, 380 U. S. 51 (1965); *Bantam Books, Inc.* v. *Sullivan*, 372 U. S. 58 (1963); *Speiser* v. *Randall*, 357 U. S. 513 (1958); *Kingsley Books, Inc.* v. *Brown*, 354 U. S. 436 (1957). Thus, only the third category in *Near* contemplated the possibility that speech meriting and entitled to constitutional protection might nevertheless be suppressed before publication in the interest of some overriding countervailing interest:

> " 'When a nation is at war many things that might be said in time of peace are such a hindrance to its effort that their utterance will not be endured so long as men fight and that no Court could regard them as protected by any constitutional right.' *Schenck* v. *United States*, 249 U. S. 47, 52. No one would question but that a government might prevent actual obstruction to its recruiting service or the publication of the sailing dates of transports or the number and location of troops." 283 U. S., at 716.

Even this third category, however, has only been adverted to in dictum and has never served as the basis for actually upholding a prior restraint against the publication of constitutionally protected materials. In *New York Times Co.* v. *United States, supra,* we specifically addressed the scope of the "military security" exception alluded to in *Near* and held that there could be no prior restraint on publication of the "Pentagon Papers" despite the fact that a majority of the Court believed that release of the documents, which were

classified "Top Secret-Sensitive" and which were obtained surreptitiously, would be harmful to the Nation and might even be prosecuted after publication as a violation of various espionage statutes. To be sure, our brief *per curiam* declared that " '[a]ny system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity,' " *id.*, at 714, quoting *Bantam Books, Inc.* v. *Sullivan, supra,* at 70, and that the "Government 'thus carries a heavy burden of showing justification for the imposition of such a restraint.' " 403 U. S., at 714, quoting *Organization for a Better Austin* v. *Keefe,* 402 U. S. 415, 419 (1971). This does not mean, as the Nebraska Supreme Court assumed,[18] that prior restraints can be justified on an *ad hoc* balancing approach that concludes that the "presumption" must be overcome in light of some perceived "justification." Rather, this language refers to the fact that, as a matter of procedural safeguards and burden of proof, prior restraints even within a recognized exception to the rule against prior restraints will be extremely difficult to justify; but as an initial matter, the purpose for which a prior restraint is sought to be imposed "must fit within one of the narrowly defined exceptions to the prohibition against prior restraints." *Southeastern Promotions, Ltd.* v. *Conrad,* 420 U. S., at 559; see also, *e. g., id.,* at 555; *Pittsburgh Press Co.* v. *Human Rel. Comm'n,* 413 U. S. 376, 382 (1973); *Organization for a Better Austin* v. *Keefe, supra,* at 419–420; cf., *e. g., Healy* v. *James,* 408 U. S. 169 (1972); *Freedman* v. *Maryland,* 380 U. S., at 58–59. Indeed, two Justices in *New York Times* apparently controverted the existence of even a limited "military security" exception to the rule against prior restraints on the publication of otherwise protected material, see 403 U. S.,

---

[18] See n. 33, *infra; supra,* at 582–583.

at 714 (Black, J., concurring); *id.*, at 720 (Douglas, J., concurring). And a majority of the other Justices who expressed their views on the merits made it clear that they would take cognizance only of a "single, extremely narrow class of cases in which the First Amendment's ban on prior judicial restraint may be overridden." *Id.*, at 726 (BRENNAN, J., concurring). Although variously expressed, it was evident that even the exception was to be construed very, very narrowly: when disclosure "will *surely result in direct, immediate, and irreparable damage* to our Nation or its people," *id.*, at 730 (STEWART, J., joined by WHITE, J., concurring) (emphasis supplied) or when there is "governmental allegation and proof that publication must *inevitably, directly, and immediately* cause the occurrence of an event kindred to imperiling the safety of a transport already at sea . . . . [But] [i]n no event may mere conclusions be sufficient." *Id.*, at 726–727 (BRENNAN, J., concurring) (emphasis supplied). See also *id.*, at 730–731 (WHITE, J., joined by STEWART, J., concurring) ("concededly extraordinary protection against prior restraints enjoyed by the press under our constitutional system" is not overcome even by a showing that "revelation of these documents will do substantial damage to public interests").[19] It is thus clear that even within the sole possible exception to the prohibition against prior restraints on publication of constitutionally protected materials,

---

[19] The rarity of prior restraint cases of any type in this Court's jurisprudence has also been noted. See, *e. g., New York Times Co.* v. *United States*, 403 U. S., at 733; *Near* v. *Minnesota ex rel. Olson*, 283 U. S., at 718 ("The fact that for approximately one hundred and fifty years there has been almost an entire absence of attempts to impose previous restraints upon publications relating to the malfeasance of public officers is significant of the deep-seated conviction that such restraints would violate constitutional right").

the obstacles to issuance of such an injunction are formidable. What respondents urge upon us, however, is the creation of a new, potentially pervasive exception to this settled rule of virtually blanket prohibition of prior restraints.[20]

I would decline this invitation. In addition to the almost insuperable presumption against the constitutionality of prior restraints even under a recognized exception, and however laudable the State's motivation for imposing restraints in this case,[21] there are compelling

---

[20] The Nebraska Supreme Court denigrated what it termed the "extremist and absolutist" position of petitioners for assuming that "each and every exercise of freedom of the press is equally important" and that "there can be no degree of values for the particular right in which the absolutist has a special interest." 194 Neb., at 799, 800, 236 N. W. 2d, at 804. This seriously mischaracterizes petitioners' contentions, for petitioners do not assert that First Amendment freedoms are paramount in all circumstances. For example, this case does not involve the question of when, if ever, the press may be held in contempt subsequent to publication of certain material, see *Wood* v. *Georgia,* 370 U. S. 375 (1962); *Craig* v. *Harney,* 331 U. S. 367, 376 (1947); *Pennekamp* v. *Florida,* 328 U. S. 331 (1946); *Bridges* v. *California,* 314 U. S. 252 (1941). Nor does it involve the question of damages actions for malicious publication of erroneous material concerning those involved in the criminal justice system, see *New York Times Co.* v. *Sullivan,* 376 U. S. 254 (1964). See also *Time, Inc.* v. *Firestone,* 424 U. S. 448 (1976); *Gertz* v. *Robert Welch, Inc.,* 418 U. S. 323 (1974). And no contention is made that the press would be immune from criminal liability for crimes committed in acquiring material for publication. However, to the extent petitioners take a forceful stand against the imposition of any prior restraints on publication, their position is anything but "extremist," for the history of the press under our Constitution has been one in which freedom from prior restraint *is* all but absolute.

[21] One can understand the reasons why the four prior restraint orders issued in this case. The crucial importance of preserving Sixth Amendment rights was obviously of uppermost concern, and the question had not been definitively resolved in this Court. Our

reasons for not carving out a new exception to the rule against prior censorship of publication.

## 1

Much of the information that the Nebraska courts

language concerning the "presumption" against prior restraints could have been misinterpreted to condone an *ad hoc* balancing approach rather than merely to state the test for assessing the adequacy of procedural safeguards .and for determining whether the high burden of proof had been met in a case falling within one of the categories that constitute the exceptions to the rule against prior restraints. Indeed, in *Branzburg* v. *Hayes,* 408 U. S. 665 (1972), there was even an intimation that such restraints might be permissible, since the Court stated that "[n]ewsmen have no constitutional right of access to the scenes of crime or disaster when the general public is excluded, and *they may be prohibited from attending or publishing information about trials if such restrictions are necessary to assure a defendant a fair trial before an impartial tribunal." Id.,* at 684–685 (emphasis supplied). However, the Court in *Branzburg* had taken pains to emphasize that the case, which presented the question whether the First Amendment accorded a reporter a testimonial privilege for an agreement not to reveal facts relevant to a grand jury's investigation of a crime or the criminal conduct of his source, did not involve any "prior restraint or restriction on what the press may publish." *Id.,* at 681. It was evident from the full passage in which the sentence appeared, which focused on the fact that there is no "constitutional right of special access [by the press] to information not available to the public generally," *id.,* at 684, that the passage is best regarded as indicating that to the extent newsmen are properly excluded from judicial proceedings, they would probably be unable to report about those proceedings. See generally *id.,* at 683–685. See also *id.,* at 691 (decision "involves no restraint on what newspapers may publish or on the type or quality of information reporters may seek to acquire"); *Pell* v. *Procunier,* 417 U. S. 817, 833–834 (1974). It is clear that the passage was not intended to decide the important question presented by this case. In any event, in light of my views respecting prior restraints, it should be unmistakable that the First Amendment stands as an absolute bar even to the imposition of interim restraints on reports or commentary relating to the criminal

enjoined petitioners from publishing was already in the public domain, having been revealed in open court proceedings or through public documents. Our prior cases have foreclosed any serious contention that further disclosure of such information can be suppressed before publication or even punished after publication. "A trial is a public event. What transpires in the court room is public property. . . . Those who see and hear what transpired can report it with impunity. There is no special perquisite of the judiciary which enables it, as distinguished from other institutions of democratic government, to suppress, edit, or censor events which transpire in proceedings before it." *Craig* v. *Harney,* 331 U. S., at 374. Similarly, *Estes* v. *Texas,* 381 U. S., at 541–542, a case involving the Sixth Amendment right to a fair trial, observed: "[R]eporters of all media . . . are plainly free to report whatever occurs in open court through their respective media. This was settled in *Bridges* v. *California,* 314 U. S. 252 (1941), and *Pennekamp* v. *Florida,* 328 U. S. 331 (1946), which we reaffirm." See also *id.,* at 583–585 (Warren, C. J., concurring). And *Sheppard* v. *Maxwell,* 384 U. S., at 362–363, a case that detailed numerous devices that could be employed for ensuring fair trials, explicitly reiterated that "[o]f course, there is nothing that proscribes the press from reporting events that transpire in the courtroom." See also *id.,* at 350; *Stroble* v. *California,* 343 U. S. 181, 193 (1952). The continuing vitality of these statements was reaffirmed only last Term in *Cox Broadcasting Corp.* v. *Cohn,* a case involving a suit for damages brought after publication under state law recognizing the privacy interest of its citizens. In holding that

---

justice system, and that to the extent anything in *Branzburg* could be read as implying a different result, I think that it should be disapproved. Cf. *New York Times Co.* v. *United States, supra,* at 724–725 (BRENNAN, J., concurring).

a "State may [not] impose sanctions on the accurate publication of the name of a rape victim obtained from public records," 420 U. S., at 491, we observed:

"[I]n a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the press to bring to him in convenient form the facts of those operations. *Great responsibility is accordingly placed upon the news media to report fully and accurately the proceedings of government, and official records and documents open to the public are the basic data of governmental operations.* Without the information provided by the press most of us and many of our representatives would be unable to vote intelligently or to register opinions on the administration of government generally. *With respect to judicial proceedings in particular, the function of the press serves to guarantee the fairness of trials and to bring to bear the beneficial effects of public scrutiny upon the administration of justice.* See *Sheppard* v. *Maxwell,* 384 U. S. 333, 350 (1966).

"Appellee has claimed in this litigation that the efforts of the press have infringed his right to privacy by broadcasting to the world the fact that his daughter was a rape victim. *The commission of crime, prosecutions resulting from it, and judicial proceedings arising from the prosecutions, however, are without question events of legitimate · concern to the public and consequently fall within the responsibility of the press to report the operations of government.*

"*The special protected nature of accurate reports of judicial proceedings has repeatedly been recognized.*" *Id.,* at 491–492 (emphasis supplied).

"By placing the information in the public domain on official court records, the State must be presumed to have concluded that the public interest was thereby being served. *Public records by their very nature are of interest to those concerned with the administration of government, and a public benefit is performed by the reporting of the true contents of the records by the media. The freedom of the press to publish that information appears to us to be of critical importance to our type of government in which the citizenry is the final judge of the proper conduct of public business.* In preserving that form of government the First and Fourteenth Amendments command nothing less than that the States may not impose sanctions on the publication of truthful information contained in official court records open to public inspection." *Id.,* at 495 (emphasis supplied).

See also *id.,* at 496. Prior restraints are particularly anathematic to the First Amendment, and any immunity from punishment subsequent to publication of given material applies *a fortiori* to immunity from suppression of that material before publication. Thus, in light of *Craig,* which involved a contempt citation for a threat to the administration of justice, and *Cox Broadcasting,* which similarly involved an attempt to establish civil liability after publication, it should be clear that no injunction against the reporting of such information can be permissible.

### 2

The order of the Nebraska Supreme Court also applied, of course, to "confessions" and other information "strongly implicative" of the accused which were obtained from sources other than official records or open

court proceedings. But for the reasons that follow—reasons equally applicable to information obtained by the press from official records or public court proceedings—I believe that the same rule against prior restraints governs *any* information pertaining to the criminal justice system, even if derived from nonpublic sources and regardless of the means employed by the press in its acquisition.

The only exception that has thus far been recognized even in dictum to the blanket prohibition against prior restraints against publication of material which would otherwise be constitutionally shielded was the "military security" situation addressed in *New York Times Co.* v. *United States.* But unlike the virtually certain, direct, and immediate harm required for such a restraint under *Near* and *New York Times,* the harm to a fair trial that might otherwise eventuate from publications which are suppressed pursuant to orders such as that under review must inherently remain speculative.

A judge importuned to issue a prior restraint in the pretrial context will be unable to predict the manner in which the potentially prejudicial information would be published, the frequency with which it would be repeated or the emphasis it would be given, the context in which or purpose for which it would be reported, the scope of the audience that would be exposed to the information,[22]

---

[22] It is suggested that prior restraints are really only necessary in "small towns," since media saturation would be more likely and incriminating materials that are published would therefore probably come to the attention of all inhabitants. Of course, the smaller the community, the more likely such information would become available through rumors and gossip, whether or not the press is enjoined from publication. For example, even with the restrictive order in the *Simants* case, all residents of Sutherland had to be excluded from the jury. Indeed, the media in such situations could help dispel erroneous conceptions circulating among

or the impact, evaluated in terms of current standards for assessing juror impartiality,[23] the information would have on that audience. These considerations would render speculative the prospective impact on a fair trial of reporting even an alleged confession or other information "strongly implicative" of the accused. Moreover, we can take judicial notice of the fact that given the prevalence of plea bargaining, few criminal cases proceed to trial, and the judge would thus have to predict what the likelihood was that a jury would even have to be impaneled.[24] Indeed, even in cases that do proceed to trial, the material sought to be suppressed before trial will often be admissible and may be admitted in any event.[25]

---

the populace. And the smaller the community, the more likely there will be a need for a change of venue in any event when a heinous crime is committed. There is, in short, no justification for conditioning the scope of First Amendment protection the media will receive on the size of the community they serve.

[23] Some exposure to the facts of a case need not, under prevailing law concerning the contours of the Sixth Amendment right to an impartial jury, disqualify a prospective juror or render him incapable of according the accused a fair hearing based solely on the competent evidence adduced in open court. "[E]xposure to information about a state defendant's prior convictions or to news accounts of the crime with which he is charged [does not] alone presumptively deprive the defendant of due process." *Murphy* v. *Florida,* 421 U. S. 794, 799 (1975). See also, *e. g., id.,* at 800, and n. 4; *Beck* v. *Washington,* 369 U. S. 541, 555–558 (1962); *Irvin* v. *Dowd,* 366 U. S. 717, 722–723 (1961); *Reynolds* v. *United States,* 98 U. S. 145, 155–156 (1879).

[24] Of course, judges accepting guilty pleas must guard against the danger that pretrial publicity has effectively coerced the defendant into pleading guilty.

[25] Cf. *Stroble* v. *California,* 343 U. S. 181, 195 (1952). For example, all of the material that was suppressed in this case was eventually admitted at Simants' trial. Indeed, even if Simants' statements to police officials had been deemed involuntary and thus suppressed, no one has suggested that confessions or statements against

And, more basically, there are adequate devices for screening from jury duty those individuals who have in fact been exposed to prejudicial pretrial publicity.

Initially, it is important to note that once the jury is impaneled, the techniques of sequestration of jurors and control over the courtroom and conduct of trial should prevent prejudicial publicity from infecting the fairness of judicial proceedings.[26] Similarly, judges may stem much of the flow of prejudicial publicity at its source, before it is obtained by representatives of the press.[27] But even if the press nevertheless obtains potentially prejudicial information and decides to publish that infor-

---

interest made by an accused to private individuals, for example, would be inadmissible.

[26] Failure of the trial judge to take such measures was a significant factor in our reversals of the convictions in *Sheppard* v. *Maxwell*, 384 U. S. 333 (1966), and *Estes* v. *Texas*, 381 U. S. 532 (1965).

[27] A significant component of prejudicial pretrial publicity may be traced to public commentary on pending cases by court personnel, law enforcement officials, and the attorneys involved in the case. In *Sheppard* v. *Maxwell, supra,* we observed that "the trial court might well have proscribed extrajudicial statements by any lawyer, party, witness, or court official which divulged prejudicial matters." 384 U. S., at 361. See also *id.,* at 360 ("[T]he judge should have further sought to alleviate this problem [of publicity that misrepresented the trial testimony] by imposing control over the statements made to the news media by counsel, witnesses, and especially the Coroner and police officers"); *id.,* at 359, 363. As officers of the court, court personnel and attorneys have a fiduciary responsibility not to engage in public debate that will redound to the detriment of the accused or that will obstruct the fair administration of justice. It is very doubtful that the court would not have the power to control release of information by these individuals in appropriate cases, see *In re Sawyer,* 360 U. S. 622 (1959), and to impose suitable limitations whose transgression could result in disciplinary proceedings. Cf. *New York Times Co.* v. *United States,* 403 U. S., at 728–730 (STEWART, J., joined by WHITE, J., concurring). Similarly, in most cases courts would have ample power to control such actions by law enforcement personnel.

mation, the Sixth Amendment rights of the accused may still be adequately protected. In particular, the trial judge should employ the *voir dire* to probe fully into the effect of publicity. The judge should broadly explore such matters as the extent to which prospective jurors had read particular news accounts or whether they had heard about incriminating data such as an alleged confession or statements by purportedly reliable sources concerning the defendant's guilt. See, *e. g., Ham* v. *South Carolina,* 409 U. S. 524, 531–534 (1973) (opinion of MARSHALL, J.); *Swain* v. *Alabama,* 380 U. S. 202, 209–222 (1965). Particularly in cases of extensive publicity, defense counsel should be accorded more latitude in personally asking or tendering searching questions that might root out indications of bias, both to facilitate intelligent exercise of peremptory challenges and to help uncover factors that would dictate disqualification for cause. Indeed, it may sometimes be necessary to question on *voir dire* prospective jurors individually or in small groups, both to maximize the likelihood that members of the venire will respond honestly to questions concerning bias, and to avoid contaminating unbiased members of the venire when other members disclose prior knowledge of prejudicial information. Moreover, *voir dire* may indicate the need to grant a brief continuance [28] or to grant a change of venue,[29] techniques that can ef-

---

[28] Excessive delay, of course, would be impermissible in light of the Sixth Amendment right to a speedy trial. See, *e. g., Barker* v. *Wingo,* 407 U. S. 514 (1972). However, even short continuances can be effective in attenuating the impact of publicity, especially as other news crowds past events off the front pages. And somewhat substantial delays designed to ensure fair proceedings need not transgress the speedy trial guarantee. See *Groppi* v. *Wisconsin,* 400 U. S. 505, 510 (1971); cf. 18 U. S. C. § 3161 (h) (8) (1970 ed., Supp. IV).

[29] In *Rideau* v. *Louisiana,* 373 U. S. 723 (1963), we held that it

fectively mitigate any publicity at a particular time or in a particular locale. Finally, if the trial court fails or refuses to utilize these devices effectively, there are the "palliatives" of reversals on appeal and directions for a new trial. *Sheppard* v. *Maxwell*, 384 U. S., at 363.[30] We have indicated that even in a case involving outrageous publicity and a "carnival atmosphere" in the courtroom, "these procedures would have been sufficient to guarantee [the defendant] a fair trial . . . ." *Id.*, at 358. See generally *id.*, at 358–363; cf. *Times-Picayune Pub. Corp.* v. *Schulingkamp*, 419 U. S. 1301, 1308, and n. 3 (1974) (POWELL, J., in chambers). For this reason, the one thing *Sheppard* did not approve was "any direct limitations on the freedom traditionally exercised by the news media." 384 U. S., at 350.[31] Indeed, the

was a denial of due process to deny a request for a change of venue that was necessary to preserve the accused's Sixth Amendment rights. And state statutes may not restrict changes of venue if to do so would deny an accused a fair trial. *Groppi* v. *Wisconsin*, *supra*.

[30] To be sure, as the Supreme Court of Nebraska contended, society would be paying a heavy price if an individual who is in fact guilty must be released. But in no decision of this Court has it been necessary to release an accused on the ground that an impartial jury could not be assembled; we remanded for further proceedings, assuming that a retrial before an impartial forum was still possible.

As to the contention that pretrial publicity may result in conviction of an innocent person, surely the trial judge has adequate means to control the *voir dire*, the conduct of trial, and the actions of the jury, so as to preclude that untoward possibility. Indeed, where the evidence presented at trial is insufficient, the trial judge has the responsibility not even to submit the case to the jury.

[31] Although various committees that have recently analyzed the "Free Press/Fair Trial" issue have differed over the devices that they believed could properly be employed to ensure fair trials, they have unanimously failed to embrace prior restraints on publication as within the acceptable methods. See, *e. g.*, Report of the Judi-

traditional techniques approved in *Sheppard* for ensuring fair trials would have been adequate in every case in which we have found that a new trial was required due to lack of fundamental fairness to the accused.

For these reasons alone I would reject the contention that speculative deprivation of an accused's Sixth Amendment right to an impartial jury is comparable to the damage to the Nation or its people that *Near* and *New York Times* would have found sufficient to justify a prior restraint on reporting. Damage to that Sixth Amendment right could never be considered so direct, immediate and irreparable, and based on such proof rather than speculation, that prior restraints on the press could be justified on this basis.

## C

There are additional, practical reasons for not starting down the path urged by respondents.[32] The exception

---

cial Conference Committee on the Operation of the Jury System, "Free Press-Fair Trial" Issue, 45 F. R. D. 391, 401–402 (1968) (Judicial Conference Committee headed by Judge Kaufman); Special Committee on Radio, Television, and the Administration of Justice of the Association of the Bar of the City of New York, Freedom of the Press and Fair Trial: Final Report with Recommendations 10–11 (1967); American Bar Association Project on Standards for Criminal Justice, Fair Trial and Free Press 68–73 (App. Draft 1968); see also American Bar Association, Legal Advisory Committee on Fair Trial and Free Press, Recommended Court Procedure to Accommodate Rights of Fair Trial and Free Press 7 (Rev. Draft, Nov. 1975).

[32] I include these additional considerations, many of which apply generally to any system of prior restraints, only because of the fundamentality of the Sixth Amendment right invoked as the justification for imposition of the restraints in this case; the fact that there are such overwhelming reasons for precluding *any* prior restraints even to facilitate preservation of such a fundamental right reinforces the longstanding constitutional doctrine that there is effectively an absolute prohibition against prior restraints of publi-

to the prohibition of prior restraints adumbrated in *Near* and *New York Times* involves no judicial weighing of the countervailing public interest in receiving the suppressed information; the direct, immediate, and irreparable harm that would result from disclosure is simply deemed to outweigh the public's interest in knowing, for example, the specific details of troop movements during wartime. As the Supreme Court of Nebraska itself admitted,[33] however, any attempt to impose a prior restraint on the reporting of information concerning the operation of the criminal justice system will inevitably involve the courts in an *ad hoc* evaluation of the need for the public to receive particular information that might nevertheless implicate the accused as the perpetrator of a crime. For example, disclosure of the

---

cation of *any* material otherwise covered within the meaning of the free press guarantee of the First Amendment. See *supra*, at 588–594.

[33] For example, in addition to numerous comments about accommodating First and Sixth Amendment rights in each case, the court observed:

"That the press be absolutely free to report corruption and wrongdoing, actual or apparent, or incompetence of public officials of whatever branch of government is vastly important to the future of our state and nation cannot be denied as anyone who is familiar with recent events must be well aware. Prior restraint of the press, however slight, in such instances is unthinkable. Near v. Minnesota ex rel. Olson, *supra*. In these instances and many others no preferred constitutional rights collide.

"In cases where equally important constitutional rights may collide then it would seem that under some circumstances, rare though they will be, that an accommodation of some sort must be reached." 194 Neb., at 798–799, 236 N. W. 2d, at 803–804.

Thus, at least when reporting of information "strongly implicative" of the accused also reflects on official actions, a particularized analysis of the need to disseminate the information is contemplated even by those who believe prior restraints might sometimes be justifiable with respect to commentary on the criminal justice system.

circumstances surrounding the obtaining of an involuntary confession or the conduct of an illegal search resulting in incriminating fruits may be the necessary predicate for a movement to reform police methods, pass regulatory statutes, or remove judges who do not adequately oversee law enforcement activity; publication of facts surrounding particular plea-bargaining proceedings or the practice of plea bargaining generally may provoke substantial public concern as to the operations of the judiciary or the fairness of prosecutorial decisions; reporting the details of the confession of one accused may reveal that it may implicate others as well, and the public may rightly demand to know what actions are being taken by law enforcement personnel to bring those other individuals to justice; commentary on the fact that there is strong evidence implicating a government official in criminal activity goes to the very core of matters of public concern, and even a brief delay in reporting that information shortly before an election may have a decisive impact on the outcome of the democratic process, see *Carroll* v. *Princess Anne*, 393 U. S., at 182; dissemination of the fact that indicted individuals who had been accused of similar misdeeds in the past had not been prosecuted or had received only mild sentences may generate crucial debate on the functioning of the criminal justice system; revelation of the fact that despite apparently overwhelming evidence of guilt, prosecutions were dropped or never commenced against large campaign contributors or members of special interest groups may indicate possible corruption among government officials; and disclosure of the fact that a suspect has been apprehended as the perpetrator of a heinous crime may be necessary to calm community fears that the actual perpetrator is still at large. Cf. *Times-Picayune Pub. Corp.* v. *Schulingkamp*, 419 U. S., at 1302

(POWELL, J., in chambers).[34]   In all of these situations, judges would be forced to evaluate whether the public interest in receiving the information outweighed the speculative impact on Sixth Amendment rights.

These are obviously only some examples of the problems that plainly would recur, not in the almost theoretical situation of suppressing disclosure of the location of troops during wartime, but on a regular basis throughout the courts of the land.  Recognition of any judicial authority to impose prior restraints on the basis of harm to the Sixth Amendment rights of particular defendants, especially since that harm must remain speculative, will thus inevitably interject judges at all levels into censorship roles that are simply inappropriate and impermissible under the First Amendment.  Indeed, the potential for arbitrary and excessive judicial utilization of any such power would be exacerbated by the fact that judges and committing magistrates might in some cases be determining the propriety of publishing information that reflects on their competence, integrity, or general performance on the bench.

There would be, in addition, almost intractable procedural difficulties associated with any attempt to impose prior restraints on publication of information relating to pending criminal proceedings, and the ramifications of these procedural difficulties would accentuate the burden on First Amendment rights.  The incentives and dynamics of the system of prior restraints would inevitably lead to overemployment of the technique.  In order to minimize pretrial publicity against

---

[34] Prior restraints may also effectively curtail the incentives for independent investigative work by the media which could otherwise uncover evidence of guilt or exonerating evidence that nevertheless threatens the Sixth Amendment rights of others by strongly implicating them in illegal activity.

his clients and pre-empt ineffective-assistance-of-counsel claims, counsel for defendants might routinely seek such restrictive orders. Prosecutors would often acquiesce in such motions to avoid jeopardizing a conviction on appeal. And although judges could readily reject many such claims as frivolous, there would be a significant danger that judges would nevertheless be predisposed to grant the motions, both to ease their task of ensuring fair proceedings and to insulate their conduct in the criminal proceeding from reversal. We need not raise any specter of floodgates of litigation or drain on judicial resources to note that the litigation with respect to these motions will substantially burden the media. For to bind the media, they would have to be notified and accorded an opportunity to be heard. See, e. g., Carroll v. Princess Anne, supra; McKinney v. Alabama, 424 U. S. 669 (1976). This would at least entail the possibility of restraint proceedings collateral to every criminal case before the courts, and there would be a significant financial drain on the media involuntarily made parties to these proceedings. Indeed, small news organs on the margin of economic viability might choose not to contest even blatantly unconstitutional restraints or to avoid all crime coverage, with concomitant harm to the public's right to be informed of such proceedings.[35] Such acquiescence might also mean that significant erroneous precedents will remain unchallenged, to be relied on for even broader restraints in the future. Moreover, these collateral restraint proceedings would be unlikely to result in equal treatment of all

---

[35] Indeed, to the extent media notified of the restraint proceedings choose not to appear in light of the cost and time potentially involved in overturning any restraint ultimately imposed, there will be no presentation of the countervailing public interest in maintaining a free flow of information, as opposed to the interests of prosecution, defense, and judges in maintaining fair proceedings.

organs of the media [36] and, even if all the press could be brought into the proceeding, would often be ineffective, since disclosure of incriminating material may transpire before an effective restraint could be imposed.[37]

To be sure, because the decision to impose such restraints even on the disclosure of supposedly narrow categories of information would depend on the facts of each case, and because precious First Amendment rights are at stake, those who could afford the substantial costs would seek appellate review. But that review is often inadequate, since delay inherent in judicial proceedings could itself destroy the contemporary news value of the information the press seeks to disseminate.[38] As one commentator has observed:

> "Prior restraints fall on speech with a brutality and a finality all their own. Even if they are ultimately lifted they cause irremediable loss—a loss in the immediacy, the impact, of speech. . . . Indeed it is the hypothesis of the First Amendment that injury is inflicted on our society when we stifle the immediacy of speech." A. Bickel, The Morality of Consent 61 (1975).[39]

---

[36] For example, in this case the restraints only applied to petitioners, who improperly intervened in the criminal case and thus subjected themselves to the court's jurisdiction. The numerous *amici*, however, were not subject to the restraining orders and were free to disseminate prejudicial information in the same areas in which petitioners were precluded from doing so.

[37] Cf. *New York Times Co.* v. *United States*, 403 U. S., at 733 (WHITE, J., joined by STEWART, J., concurring).

[38] In this case, prior restraints were in effect for over 11 weeks, and yet by the time those restraints expired, appellate review had not yet been exhausted. Moreover, appellate courts might not accord these cases the expedited hearings they so clearly would merit. See Tr. of Oral Arg. 43–48.

[39] As we observed in *Bridges* v. *California*, 314 U. S., at 268, which held that the convictions of a newspaper publisher and editor

And, as noted, given the significant financial disincentives, particularly on the smaller organs of the media,[40] to challenge any restrictive orders once they are imposed

for contempt, based on editorial comment concerning pending cases, were violative of the First Amendment:

"It must be recognized that public interest is much more likely to be kindled by a controversial event of the day than by a generalization, however penetrating, of the historian or scientist. Since they . punish utterances made during the pendency of a case, the judgments below therefore produce their restrictive results at the precise time when public interest in the matters discussed would naturally be at its height. Moreover, the ban is likely to fall not only at a crucial time but upon the most important topics of discussion.

"No suggestion can be found in the Constitution that the freedom there guaranteed for speech and the press bears an inverse ratio to the timeliness and importance of the ideas seeking expression. Yet, it would follow as a practical result of the decisions below that anyone who might wish to give public expression to his views on a pending case involving no matter what problem of public interest, just at the time his audience would be most receptive, would be as effectively discouraged as if a deliberate statutory scheme of censorship had been adopted. . . .

"This unfocussed threat is, to be sure, limited in time, terminating as it does upon final disposition of the case. But this does not change its censorial quality. An endless series of moratoria on public discussion, even if each were very short, could hardly be dismissed as an insignificant abridgment of freedom of expression. And to assume that each would be short is to overlook the fact that the 'pendency' of a case is frequently a matter of months or even years rather than days or weeks." *Id.,* at 269.

See also *id.,* at 277–278; *Carroll* v. *Princess Anne,* 393 U. S., at 182; *Wood* v. *Georgia,* 370 U. S., at 392; *Pennekamp* v. *Florida,* 328 U. S., at 346–347.

[40] The editor and publisher of *amicus* Anniston (Ala.) Star poignantly depicted in a letter to counsel the likely plight of such small, independent newspapers if the power to impose prior restraints against pretrial publicity were recognized:

"Small town dailies would be the unknown, unseen and friendless

by trial judges, there is the distinct possibility that many erroneous impositions would remain uncorrected.[41]

### III

I unreservedly agree with Mr. Justice Black that "free speech and fair trials are two of the most cherished policies of our civilization, and it would be a trying task to choose between them." *Bridges* v. *California*, 314 U. S., at 260. But I would reject the notion that a

---

victims if the Supreme Court upholds the order of Judge Stuart. If the already irresistible powers of the judiciary are swollen by absorbing an additional function, that of government censor, the chilling effect upon vigorous public debate would be deepest in the thousands of small towns where independent, locally owned, daily and weekly newspapers are published.

"Our papers are not read in the White House, the Congress, the Supreme Court or by network news executives. The causes for which we contend and the problems we face are invisible to the world of power and intellect. We have no in-house legal staff. We retain no great, national law firms. We do not have spacious profits with which to defend ourselves and our principles, all the way to the Supreme Court, each and every time we feel them to be under attack.

"Our only alternative is obedient silence. You hear us when we speak now. Who will notice if we are silenced? The small town press will be the unknown soldier of a war between the First and Sixth Amendments, a war that should never have been declared, and can still be avoided.

"Only by associating ourselves in this brief with our stronger brothers are we able to raise our voices on this issue at all, but I am confident that the Court will listen to us because we represent the most defenseless among the petitioners." Brief for Washington Post Co. et al. as *Amici Curiae* 31–32.

[41] There is also the danger that creation of a second "narrow" category of exceptions to the rule against prior restraints would be interpreted as a license to create further "narrow" exceptions when some "justification" for overcoming a mere "presumption" of unconstitutionality is presented. Such was the reasoning which eventuated in this litigation in the first place. See *supra*, at 582–583.

choice is necessary, that there is an inherent conflict that cannot be resolved without essentially abrogating one right or the other. To hold that courts cannot impose any prior restraints on the reporting of or commentary upon information revealed in open court proceedings, disclosed in public documents, or divulged by other sources with respect to the criminal justice system is not, I must emphasize, to countenance the sacrifice of precious Sixth Amendment rights on the altar of the First Amendment. For although there may in some instances be tension between uninhibited and robust reporting by the press and fair trials for criminal defendants, judges possess adequate tools short of injunctions against reporting for relieving that tension. To be sure, these alternatives may require greater sensitivity and effort on the part of judges conducting criminal trials than would the stifling of publicity through the simple expedient of issuing a restrictive order on the press; but that sensitivity and effort is required in order to ensure the full enjoyment and proper accommodation of both First and Sixth Amendment rights.

There is, beyond peradventure, a clear and substantial damage to freedom of the press whenever even a temporary restraint is imposed on reporting of material concerning the operations of the criminal justice system, an institution of such pervasive influence in our constitutional scheme. And the necessary impact of reporting even confessions can never be so direct, immediate, and irreparable that I would give credence to any notion that prior restraints may be imposed on that rationale. It may be that such incriminating material would be of such slight news value or so inflammatory in particular cases that responsible organs of the media, in an exercise of self-restraint, would choose not to publicize that material, and not make the judicial task of safeguarding

precious rights of criminal defendants more difficult. Voluntary codes such as the Nebraska Bar-Press Guidelines are a commendable acknowledgment by the media that constitutional prerogatives bring enormous responsibilities, and I would encourage continuation of such voluntary cooperative efforts between the bar and the media. However, the press may be arrogant, tyrannical, abusive, and sensationalist, just as it may be incisive, probing, and informative. But at least in the context of prior restraints on publication, the decision of what, when, and how to publish is for editors, not judges. See, *e. g., Near* v. *Minnesota ex rel. Olson*, 283 U. S., at 720; *Cox Broadcasting Corp.* v. *Cohn*, 420 U. S., at 496; *Miami Herald Publishing Co.* v. *Tornillo*, 418 U. S., at 258; *id.*, at 259 (WHITE, J., concurring); cf. *New York Times Co.* v. *Sullivan*, 376 U. S., at 269–283. Every restrictive order imposed on the press in this case was accordingly an unconstitutional prior restraint on the freedom of the press, and I would therefore reverse the judgment of the Nebraska Supreme Court and remand for further proceedings not inconsistent with this opinion.

### APPENDIX TO OPINION OF BRENNAN, J., CONCURRING IN JUDGMENT

### NEBRASKA BAR-PRESS GUIDELINES FOR DISCLOSURE AND REPORTING OF INFORMATION RELATING TO IMMINENT OR PENDING CRIMINAL LITIGATION

These voluntary guidelines reflect standards which bar and news media representatives believe are a reasonable means of accommodating, on a voluntary basis, the correlative constitutional rights of free speech and free press with the right of an accused to a fair trial. They

are not intended to prevent the news media from inquiring into and reporting on the integrity, fairness, efficiency and effectiveness of law enforcement, the administration of justice, or political or governmental questions whenever involved in the judicial process.

As a voluntary code, these guidelines do not necessarily reflect in all respects what the members of the bar or the news media believe would be permitted or required by law.

### Information Generally Appropriate for Disclosure, Reporting

Generally, it is appropriate to disclose and report the following information:

1. The arrested person's name, age, residence, employment, marital status and similar biographical information.

2. The charge, its text, any amendments thereto, and, if applicable, the identity of the complainant.

3. The amount or conditions of bail.

4. The identity of and biographical information concerning the complaining party and victim, and, if a death is involved, the apparent cause of death unless it appears that the cause of death may be a contested issue.

5. The identity of the investigating and arresting agencies and the length of the investigation.

6. The circumstances of arrest, including time, place, resistance, pursuit, possession of and all weapons used, and a description of the items seized at the time of arrest. It is appropriate to disclose and report at the time of seizure the description of physical evidence subsequently seized other than a confession, admission or statement. It is appropriate to disclose and report the subsequent finding of weapons, bodies, contraband, stolen property and similar physical items if, in view

of the time and other circumstances, such disclosure and reporting are not likely to interfere with a fair trial.

7. Information disclosed by the public records, including all testimony and other evidence adduced at the trial.

### Information Generally Not Appropriate for Disclosure, Reporting

Generally, it is not appropriate to disclose or report the following information because of the risk of prejudice to the right of an accused to a fair trial:

1. The existence or contents of any confession, admission or statement given by the accused, except it may be stated that the accused denies the charges made against him. This paragraph is not intended to apply to statements made by the accused to representatives of the news media or to the public.

2. Opinions concerning the guilt, the innocence or the character of the accused.

3. Statements predicting or influencing the outcome of the trial.

4. Results of any examination or tests or the accused's refusal or failure to submit to an examination or test.

5. Statements or opinions concerning the credibility or anticipated testimony of prospective witnesses.

6. Statements made in the judicial proceedings outside the presence of the jury relating to confessions or other matters which, if reported, would likely interfere with a fair trial.

### Prior Criminal Records

Lawyers and law enforcement personnel should not volunteer the prior criminal records of an accused except to aid in his apprehension or to warn the public of any dangers he presents. The news media can obtain prior criminal records from the public records of the courts,

police agencies and other governmental agencies and from their own files. The news media acknowledge, however, that publication or broadcast of an individual's criminal record can be prejudicial, and its publication or broadcast should be considered very carefully, particularly after the filing of formal charges and as the time of the trial approaches, and such publication or broadcast should generally be avoided because readers, viewers and listeners are potential jurors and an accused is presumed innocent until proven guilty.

## Photographs

1. Generally, it is not appropriate for law enforcement personnel to deliberately pose a person in custody for photographing or televising by representatives of the news media.

2. Unposed photographing and televising of an accused outside the courtroom is generally appropriate, and law enforcement personnel should not interfere with such photographing or televising except in compliance with an order of the court or unless such photographing or televising would interfere with their official duties.

3. It is appropriate for law enforcement personnel to release to representatives of the news media photographs of a suspect or an accused. Before publication of any such photographs, the news media should eliminate any portions of the photographs that would indicate a prior criminal offense or police record.

## Continuing Committee for Cooperation

The members of the bar and the news media recognize the desirability of continued joint efforts in attempting to resolve any areas of differences that may arise in their mutual objective of assuring to all Americans both the correlative constitutional rights to free-

dom of speech and press and to a fair trial. The bar and the news media, through their respective associations, have determined to establish a permanent committee to revise these guidelines whenever this appears necessary or appropriate, to issue opinions as to their application to specific situations, to receive, evaluate and make recommendations with respect to complaints and to seek to effect through educational and other voluntary means a proper accommodation of the constitutional correlative rights of free speech, free press and fair trial.

June, 1970

Mr. Justice Stevens, concurring in the judgment.

For the reasons eloquently stated by Mr. Justice Brennan, I agree that the judiciary is capable of protecting the defendant's right to a fair trial without enjoining the press from publishing information in the public domain, and that it may not do so. Whether the same absolute protection would apply no matter how shabby or illegal the means by which the information is obtained, no matter how serious an intrusion on privacy might be involved, no matter how demonstrably false the information might be, no matter how prejudicial it might be to the interests of innocent persons, and no matter how perverse the motivation for publishing it, is a question I would not answer without further argument. See *Ashwander* v. *TVA*, 297 U. S. 288, 346–347 (Brandeis, J., concurring). I do, however, subscribe to most of what Mr. Justice Brennan says and, if ever required to face the issue squarely, may well accept his ultimate conclusion.